RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0132p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

RUTH MOSHOLDER,

        *Plaintiff-Appellant,*

      *v.*

PATRICIA BARNHARDT; DEWAYNE BURTON,

        *Defendants-Appellees.*

> No. 10-2586

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 09-11829—Robert H. Cleland, District Judge.

Argued: March 1, 2012

Decided and Filed: May 11, 2012

Before: COLE and STRANCH, Circuit Judges; CARR, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Michael E. Freifeld, LAW OFFICE OF GLEN N. LENHOFF, Flint, Michigan, for Appellant. Erik A. Grill, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** Michael E. Freifeld, LAW OFFICE OF GLEN N. LENHOFF, Flint, Michigan, for Appellant. Erik A. Grill, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

_____

## OPINION

_____

    JAMES G. CARR, District Judge. Plaintiff-Appellant Ruth Mosholder appeals from a grant of summary judgment on her First Amendment retaliation claim to

---

[*]The Honorable James G. Carr, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

Defendant-Appellees Patricia Barnhardt and Dewayne Burton, former and current wardens, respectively, at the Thumb Correctional Facility, a state prison in Michigan.

For the following reasons, we REVERSE and REMAND the district court's grant of summary judgment.

## Background

### A. Mosholder's Work History

Mosholder has held the position of Corrections Officer E-9 at the Michigan Department of Corrections' (MDOC) Thumb Correctional Facility (TCF) in Lapeer, Michigan since February, 2001. She became the institution's school officer in 2001. Her primary duty was to maintain order and discipline within the school.[1]   Her responsibilities included patrolling the school and, if necessary, disciplining inmates. A school officer, by the nature of the school's operations and schedule, is guaranteed weekends and holidays off. In addition, that officer's exposure to the overall prison population is vastly reduced.[2] Rotating corrections officers are not guaranteed weekends and holidays off, and must come into contact with all or virtually all of the prison population.

Mosholder received annual performance evaluations generally affirming her competence and enthusiasm in performing her assigned duties. Assigned evaluators performed each evaluation, and Warden Barnhardt or Warden Burton eventually signed off on them.

---

[1]The position was a "bid" position, which meant that whoever held it would receive the same assignment every day rather than rotating through different assignments. TCF assigns employees to bid positions based on a combination of seniority and, depending on the circumstances, interviews with relevant supervisors or administrators. Mosholder interviewed with the then-principal of the school in 2001 before receiving the school officer assignment.

[2]Mosholder states that she came in contact with less than half of TCF's population during her time as school officer.

**B. The Rap Competition and Letter**

In 2005, TCF began housing youthful offenders. Mosholder believed that these offenders were a "different population" of prisoner, and one which prison management, in her view, coddled.

TCF's administrators, led by Deputy Warden Burton, held a rap competition for youthful offenders on October 3, 2008. TCF partnered with Kettering University to hold the event, the purpose of which was to steer the offenders toward productive expression and possible careers outside of prison. Burton, a Prison Inspector and the head of the correction officers' union, judged the contest. Prison administrators screened the lyrics beforehand and disqualified any competitors whose songs referenced gangs or used profanity.

The parties disagree as to the conduct of the prisoners during the rap competition. Mosholder claims she heard gang references and saw gang signs flashed during the competition. The defendant wardens claim to have heard and seen nothing of the sort. The event passed without incident.

On October 10, 2008, Mosholder sent a letter to several Michigan state Representatives and Senators, including Representative Lee Gonzales:

> On 10/3/08, Thumb Correctional Facility (TCF) held a "rap competition" for the youthful offenders with ADW Burton (now acting Deputy Warden) and Inspector Carter (now acting ADW) as judges. I observed this competition periodically since it was being held in the gym below me. Although only about 40 inmates were authorized to be at this competition through the callout system, there were 60+ inmates in the gym since ADW Burton had our Captain bring other inmates over. Throughout this competition I observed the majority of these inmates standing, dancing, and flashing gang signs frequently. The gang signs I seen were Vice Lords, Latin Kings, and Bloods. Many of the "rappers" that I heard made references to "Detroit west side", "Detroit east side", "Detroit north side", "Detroit south side", "Joy Road" and "313". Although the MDOC doesn't recognize these groups as gangs, we know they are. The only restriction that was listed on the sign-up sheet was that profanity will not be allowed; nothing about gangs. The general feel of

the atmosphere that many officers felt was that this was a very volatile situation that was on the edge of exploding.

There was absolutely no compliance to the HOPE proper dress rules at all. Pants sagging well below the waistline, some even below the buttocks, shirts all untucked, hats on, thermal shirts worn underneath a t-shirt. The very dress rules that Inspector Carter signed for as part of the HOPE program, but chose to ignore during this competition.

It just amazes me that this is being allowed to happen. Management allowing inmates to flash gang signs and make references to gangs in their lyrics. What are they promoting? Is this MDOC's way of rehabilitating our youthful offenders? To have fun and hope to become a rap star while in prison with the help of ADW Burton and Inspector Carter, who weren't just overseeing an activity, they were participating in it, and chose to ignore policy and work rules that prohibit it. What message is this sending to our youthful offenders?

There will be more of these "rap competitions". It was announced at the end of this competition that the next one will be Friday, October 17th, at 1800 hours. It is my understanding that these inmates are competing to make the "finals" and a chance to have a "demo" made to be sent out to local radio stations. I certainly hope this isn't true, but even if it isn't, to allow our youthful offenders to behave in this manner is atrocious. I don't know all the details but many staff have spoken to me and have expressed their disbelief and disapproval that this is being allowed to happen. We have a music room program and several concerts are scheduled during the year where groups/individuals are given the opportunity to perform for the prisoner population. I have no problem with providing inmates with the tools and knowledge necessary to become successful in the music industry when they leave prison, but NOT to have a competition with the hopes of having a demo made and sent out to radio stations while they are still in prison. If I was a victim of a crime and heard a rap song on the radio from the inmate in prison that murdered or raped my child, and that MDOC promoted it, I would be outraged.

There is no structure, organization, discipline, or accountability here for these youthful offenders. I've said it before; this HOPE program is just words on paper. After 3 years of having these youthful offenders you would think there would have been some kind of improvement. It has only gotten worse. We are losing more and more control every day.

Since we received these youthful offenders in October 2005 our critical incidents have increased. In 2005 we had 31 critical incidents with only 2 employee assaults and 11 prisoner assaults. In 2006 we had 86 critical incidents with 21 employee assaults and 21 prisoner assaults. In 2007 we

had 77 critical incidents with 21 employee assaults and 33 prisoner assaults. These figures are all on the MDOC website under "Publications and Information", "Legislative Reports".

Our segregation unit, which has only 22 cells, has become nothing more than a unit with a revolving door. I started keeping track of the segregation movement in June 2007 when I noticed policy being violated with prisoners being released early for no legitimate reason as dictated by this policy. From June to December 2007 we had about 213 prisoners in segregation (about 16 of them were in for non-detention reasons). Total detention days given were about 4140 with about 2069 days served and 2071 days not served due to being released early. About 50% of days given were served. We had about 79 fighting charges, 12 prisoner assault charges, and 17 staff assault charges. Detention days for prisoners that transferred (about 59) were not included in any of the total days given/served/not served.

From January to September 2008 we've had approx. 569 prisoners in segregation (about 108 were in for non-detention reasons). Total detention days given were about 7468 with 2621 days served and 4847 days not served due to being released early. About 35% of days given were served. We've had about 217 fight charges, 40 prisoner assaults, 35 staff assaults, 7 prisoner assaults resulting in serious injury, and about 53 prisoners released from segregation before their major misconduct hearing. Detention days for prisoners that transferred (about 134) were not included in any of the total days given/served/not served.

Already from 10/1/08 to 10/13/08, we have had about 68 prisoners in segregation with 824 detention days given with only about 153 days served (18%). About 19 prisoners have been released before their major misconduct hearing. I have made every attempt to make my figures as accurate as possible.

Some of the more serious incidents we've had so far this year are:

- 3 youthful offenders had their jaws broken
- A youthful offender committed suicide in July
- A group of youthful offenders incited to riot in March, another group in September
- A youthful offender who assaulted another resulting in serious physical injury. He received 30 days detention, has to pay $3715.20 restitution, and after serving only 6 days of his detention he was sent to Essex Unit instead of being sent to the Behavior Management Unit. Essex Unit is where we house inmates that have worked their way into that unit through positive behavior.

> I urge you to come Oct. 17th to see this "rap competition" at 1800 hours, or to another one at a later day. Before you pass me off as just being disgruntled, please come and see for yourself.
>
> Thank you for you time.
>
> Sincerely,
> Ruth A. Mosholder

Representative Gonzales contacted Warden Barnhardt to obtain a response to the letter. Barnhardt investigated Mosholder's claims, and drafted a response on October 24, 2008. Barnhardt's office provided the response to Mosholder and Representative Gonzales. Barnhardt's letter reiterated the administrators' view of the October 3, 2008 event. It explained what the administration considered to be the rehabilitative purpose of the competition. There was no further communication between MDOC and Representative Gonzales on this matter, or between MDOC and any other elected official.

### C. Conflict with the School Principal

In December, 2006, TCF hired Laquita Featherstone as the school's principal. Featherstone and Mosholder had multiple run-ins with each other, and Featherstone viewed Mosholder as a too-strict disciplinarian.

In January, 2009, Mosholder and Featherstone had a confrontation over Mosholder's attempt to issue a Major Misconduct Ticket to an inmate. While in a classroom, Mosholder seized paperwork which she believed contained gang-related drawings from the prisoner. She attempted to issue a Major Misconduct Ticket for Destruction or Misuse of State Property Over $10. Featherstone asked Mosholder not to write the ticket, and leave the discipline to the classroom teacher. Mosholder refused, and stated that she would only do so if instructed by her supervisor.[3]

---

[3]It is not clear from the record to which supervisor Mosholder was referring; for our purposes it is only necessary to know that she was referring to a supervisor distinct from and, in her opinion, superior to Featherstone.

Moreover, inmates complained at a Warden's Forum on January 27, 2009, about Mosholder. Their complaints included a critique of Mosholder's ejection of prisoners from the music room. This, according to the wardens, created potential safety and security problems.

### D. Reassignment

On February 10, 2009, Burton transferred Mosholder from her school officer position to a general corrections officer position. As a result of the transfer, Mosholder would perform rotating duties at the prison in different assignments, come into contact with more of the prison population, and no longer have a work schedule allowing for consistent weekends and holidays off.

### E. Procedural History

Mosholder initially filed suit in the Circuit Court in Genesee County, Michigan. Appellees then removed the case to the Eastern District of Michigan on May 12, 2009. On December 9, 2009, Appellees filed a motion for summary judgment, which the district court subsequently denied. On October 4, 2010, Appellees filed a motion in limine on the issue of whether Mosholder's speech was on a matter of public concern. The district court interpreted this motion as a renewed motion for summary judgment. On November 30, 2010, the court granted that motion, ruling that Mosholder did not engage in protected speech. Mosholder timely appealed that order.

### Standard of Review

We review a district court's decision to grant summary judgment *de novo*. *Pagan v. Fruchey*, 492 F.3d 766, 770 (6th Cir. 2007). A court may grant summary judgment only if there are no genuine issues of material fact and one party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To support its motion, the moving party may show "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a properly supported motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In reviewing a district court's decision to grant summary judgment, we view all facts and inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita*, *supra*, 475 U.S. at 587.

## Discussion

Mosholder brings a retaliation claim under the First Amendment. To prove her claim, she must show: "1) she engaged in constitutionally protected conduct; 2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) the adverse action was motivated at least in part by [her] protected conduct." *Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005).

The district court's summary judgment opinion concluded Mosholder's speech was not on a matter of public concern. It likewise weighed the competing interests of the parties under *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), and found that Appellees' institutional interest in safety and security outweighed Mosholder's free speech interests. On appeal, the parties focus primarily on the district court's determination that Mosholder's speech was not a matter of public concern, with some argument on the *Pickering* analysis. We address both issues.[4]

---

[4] As a threshold matter, both parties and the district court agree that Mosholder's speech was not pursuant to her official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). We see no reason to disagree.

### 1. Mosholder's Speech as a Matter of Public Concern

The First Amendment may afford protection to a public employee's speech about her employer's activities where the speech relates to a matter of public concern. In determining whether such speech has First Amendment protection, a court must, under *Pickering*, 391 U.S. at 568, balance the individual's interest in free expression with the employer's interest in effectively operating its public institutions.

The "boundaries of the public concern test are not well defined." *San Diego v. Roe*, 543 U.S. 77, 83 (2004). Generally, an employee speaking as a citizen is speaking on a matter of public concern when that speech can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). Another consideration is whether the speech involves "a subject of general interest and of value and concern to the public." *Roe*, 543 U.S. at 83-84.

We live in an age where individuals possess a near-limitless ability to speak to audiences who might share their outrage at a particular controversy or allegation, turning the "matter of concern" test into a simple test of whether the statement was made and someone heard it. The more meaningful inquiry, then, calls for looking into "the content, form, and context of a given statement, as revealed by the whole record," *Connick*, *supra*, 461 U.S. at 147-48, and determining whether the employee predominantly spoke "upon matters only of personal interest" or upon matters of public concern. *Id*. at 147.

The district court relied heavily on *Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989), in reaching its finding that Mosholder did not speak on a matter of public concern. In that case, a group of disgruntled police officers serving on the Emergency Response Tactical Team sent a letter to the city's police chief; they also sent copies to several other public officials. The letter contained rather extensive complaints about the management of their team, particular decisions by police administrators, and accusations of administrative jealousy and betrayal. *Id*. at 319-20. The letter ended with

an implied endorsement of a change in administration and an offer to return all of their gear and resign. *Id*. at 320. The officers later resigned. *Id*.

This court held that the letter concerned "a matter of limited interest to members of the general public." *Id*. at 322. Finding "no hint . . . of any actual or potential wrongdoing or breach of public trust," the court affirmed the district court's grant of summary judgment to the city. *Id*. at 322-25.

The district court determined that Mosholder's letter was little more than a "quintessential employee beef," *see Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 349 (6th Cir. 2010) (quoting *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir. 1988)), and, as such, did not touch on a matter of public concern. This analysis was incorrect.

There are two ways of reading Mosholder's letter. The first, which the district court embraced, is as the airing of personal complaints about a management practice with which Mosholder disagreed, albeit dressed up as a larger treatise on the prison's failure to rehabilitate inmates properly. The second is as a specific instance of the prison failing to accomplish its rehabilitative goals, as manifest in inmate behavior during the rap competition, accompanied by a series of statistics providing a wider view of the problems.

The second reading more closely adheres to the content, form and context of the letter. "[T]he pertinent question is not *why* the employee spoke, but *what* he said . . . ." *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004) (emphasis in original). We are concerned with the distinction between matters of public concern and those only of private interest, "not [between] civic-minded motives and self-serving motives." *Chappel v. Montgomery Cnty. Fire Protection*, 131 F.3d 564, 575 (6th Cir. 1997).

Mosholder disagreed with the operation of an institution charged with protecting the public. She was almost certainly motivated, at least in part, by personal disagreement with the manner in which the prison administration ran TCF. Correct operation of that institution is a matter of public concern. *Mattox v. City of Forest Park*, 183 F.3d 515,

521 (6th Cir. 1999). This court's evaluation of her letter, then, focuses on whether her complaint is merely a matter of private interest – her personal offense at a rap competition, decorated with appended statistics and expressing merely a token concern for the community – or if it remains in the realm of public concern.

The relevant analysis here is whether the communication touches "upon matters *only* of personal interest . . . ."*Connick*, 461 U.S. at 147 (emphasis added). A public concern/private interest analysis does not require that a communication be utterly bereft of private observations or even expressions of private interest. *See*, *e.g.*, *Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000) (holding that an employee was speaking on a matter of public concern even when airing a personal grievance about racial discrimination).

In *Brown*, the purpose of the letter was to vent (rather extensively) personal grievances with the administration of the officers' unit, share the officers' perception of jealousy coming from other units, their sense of betrayal by their superiors, and prospectively tender their resignations. No matter the arguable relationship between their grievances and public safety, the complaints in *Brown* did not concern "actual or potential wrongdoing or any breach of public trust . . . ." 867 F.2d at 322.

Mosholder, on the other hand, lodged complaints about the administration of a public safety facility that, in her view, promoted behavior that could offend victims and their families, and also potentially put prisoners and staff immediately, and the general public eventually, at risk. Whatever her personal motivation, including her own desire to see different policies enacted, she wrote primarily on a matter of public concern.

## 2. The *Pickering* Test

The *Pickering* test asks a court to arrive "at a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568.

The district court again looked to *Brown* in determining that the interests of the prison administration outweighed Mosholder's interests. In *Brown*, the court referenced "the importance of deference to the city's judgment on the matter of discouraging public dissension within its safety forces" in "tip[ping] the scales decisively in favor of the [police department]." 867 F.2d at 322 (citing *McMurphy v. City of Flushing*, 802 F.2d 191 (6th Cir. 1986)). The district court found that, even if Mosholder were speaking on a matter of public concern, the administration's interests in maintaining order and discipline in a prison setting would outweigh Mosholder's interest.

This interpretation of *Brown* goes too far. Even where the speech criticizes the operations of a public safety official or entity, the *Pickering* analysis requires a balancing of the "public and social importance" of the speech against the dissension it would cause in the workplace. *McMurphy*, *supra*, 802 F.2d at 198 (quoting *Hughes v. Whitmer*, 714 F.2d 1407, 1421 (8th Cir.1983)). It was not the purpose of *Brown*, nor is it the rule of this Circuit, that public safety employers have a greater weight placed on their interests in order and discipline than other employers have in their institutional interests.

This court is to "consider whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Leary v. Daeschner*, 349 F.3d 888, 900 (6th Cir. 2003).

Mosholder claims an interest in expressing the need for safe, properly rehabilitative spaces and programs to help prisoners. The wardens point to their interests in promoting order and discipline. On balance, Mosholder's letter did not undermine or threaten to undermine the prison's interests so substantially as to justify prohibiting or punishing her speech. Mosholder's speech did not interfere with her duties, advocate any disruption or defiance on the part of employees, prevent discipline by superiors, and she is not, in this regard, a confidential employee breaking a confidence. She simply raised her concern about a matter of public importance – that the prison be run in a manner

more effectively providing for the safety and rehabilitation of prisoners. Her letter, moreover, contains no request for any personal preference or exemption.

There is no indication that Mosholder's letter would materially disrupt her work environment or the performance of her duties. This is bolstered by the time Mosholder served as school officer between the composition of the letter and her transfer to general corrections officer duty, during which any issues that arose were continuations of issues predating the composition of the letter.

The *Pickering* balancing test favors Mosholder.

## Conclusion

For the foregoing reasons, we REVERSE the district court's grant of summary judgment to Appellees and REMAND for further proceedings.[5]

---

[5]Mosholder claims that the district court's denial of an earlier summary judgment motion by Appellees on the issues of whether her transfer constituted an adverse employment action and whether her letter was the cause of her transfer resolved those issues in her favor. *Mosholder v. Barnhardt*, 09-CV-11829-DT, 2010 WL 5559406 (E.D. Mich. 2010). This is a misreading of the holding. In both cases, the district court found that Mosholder met the pleading burdens sufficient to defeat summary judgment, stating that "Plaintiff has therefore identified sufficient facts to create a triable issue on [the adverse employment action issue]," *id*. at *6, and that "a jury question exists on whether Defendants would have made the decision to transfer her in the absence of her letters." *Id*. at *14. We concur in that assessment. Those issues have been decided for purposes of summary judgment, but not for trial.