NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0625n.06

No. 12-5986

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 02, 2013
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| 1651 NORTH COLLINS CORP., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LABORATORY CORPORATION OF AMERICA, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before: SILER, GIBBONS, and GRIFFIN, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge**. Laboratory Corporation of America ("LabCorp") was a tenant of a commercial building in Louisville owned by 1651 North Collins Corporation ("1651"). LabCorp vacated the building in February 2011 after providing a month's notice of its intent to do so. 1651 sued LabCorp, claiming that the parties had agreed upon a five-year lease extension in June of 2007 and that 1651 was entitled to compensation for LabCorp's decision to end the alleged lease extension prematurely. LabCorp asserts that the parties never reached an agreement on a lease extension and that it was a month-to-month tenant when it vacated the building. The district court entered summary judgment in favor of LabCorp and 1651 appealed. LabCorp has moved to dismiss the appeal for a lack of jurisdiction. For the reasons that follow, we deny the motion to dismiss and affirm the district court's judgment.

- 1 -

## I.

The predecessors-in-interest of LabCorp and 1651 signed the original commercial lease giving rise to this case on September 1, 1986. The agreement created a fifteen-year lease, running from July 1, 1987 to June 30, 2002, and gave LabCorp the option to renew the lease for another fifteen years in five-year increments. The lease also provided for "a month-to-month tenancy subject to the same covenants and conditions as otherwise herein provided" if the parties allowed the lease to lapse. Paragraph twenty-seven of the lease sets forth the procedure for exercising the five-year renewal options:

> Provided that there has been no default with respect to any of the terms and conditions of this Lease, the Tenant shall have the option to renew this lease for an additional period of five (5) years from the expiration date of the initial term. Provided further that if there has been no default with respect to any of the terms and conditions of this Lease or any renewal term thereof, the Tenant shall have options to renew this Lease for two (2) additional five-year periods. Said options for three (3) successive five-year renewal periods shall each be upon the same terms and conditions contained herein, except that the rental for each option period shall be at the then market rent for similar space in the Louisville area, but not less than the immediately preceding five-year period, and provided that Tenant shall give Landlord written notice of Tenant's intention to exercise such option no later than six months prior to the expiration of this lease or any renewal term.

On January 10, 2002, LabCorp exercised the first option and renewed its lease until June 30, 2007. The parties deviated from the baseline rental rate provided for in the renewal option by agreeing to a monthly rent of $41,250, which was lower than the rate LabCorp was paying under the original lease. They memorialized this agreement in a formal "Exercise of First Renewal Option" document signed by representatives of LabCorp and 1651.

In November 2006, LabCorp's real estate brokers, Patrick Richardson and Lawrence Williams, initiated discussions with 1651's property manager, Norman Buhrmaster, about exercising the second five-year option in the lease agreement. After Richardson, Williams, and Buhrmaster toured the building together on November 29, 2006, Richardson and Williams sent a letter to Buhrmaster proposing a new rental rate of $35,000 per month during the new five-year term. Richardson and Williams acknowledged that this rate was lower than LabCorp's current rent, but argued that it reflected LabCorp's steadily increasing maintenance costs. Buhrmaster answered the letter on December 18 but did not respond to LabCorp's proposal. He acknowledged that LabCorp had "a currently unexercised option right" that "provides certain terms for exercise of [the] option" and instructed LabCorp to inform him "[i]f it is LabCorp's decision not to exercise this option and therefore waive any further rights, except those remaining under the current term."

LabCorp's senior vice president, Mark Braune, replied to Buhrmaster with a letter dated December 26:

> On behalf of [LabCorp], we hereby exercise the (2nd) second option to renew our lease . . . as provided for in paragraph 27 of the original lease. We value the relationship with [Buhrmaster's property management firm] over the past 20 years, which has helped to facilitate our growth.
>
> In addressing LabCorp's needs going forward, we hope to structure the lease renewal with an eye toward the optimum term, while simultaneously addressing the deteriorating condition of the facility. Facing an ever changing business climate, it is paramount that LabCorp (a) achieve efficiencies in the operation of the building, (b) have a sound water-tight roof, and (c) install a modern energy-efficient HVAC System.
>
> Through our brokers [Richardson and Williams], we look forward to the initiation of negotiations to determine the appropriate market rent. We are confident this will result in a timely lease extension.

- 3 -

On or around January 9, 2007, Buhrmaster claims he began discussions with Williams and Richardson about the rental rate. After bringing in an appraiser to determine the market rate for the property, Buhrmaster sent a letter to Braune, Williams, and Richardson on June 27, 2007, stating that 1651 "accept[ed] the conditions of the 5 year lease renewal as provided in the lease and further agree[d] to continue the rent at $41,250.00 monthly"—the lowest rate permitted under the lease agreement's renewal provisions. Richardson and Williams made multiple efforts between December 26, 2006 and June 27, 2007 to engage Buhrmaster in "negotiations" about the rate, but Buhrmaster did not respond to them.

On July 17, 2007, Silvi Santovenia, who worked on behalf of Buhrmaster, sent Richardson a letter with attached copies of a document entitled "Exercise of Second Renewal Option." This document was similar to the "Exercise of First Renewal Option" that 1651 and LabCorp executed in 2002. Buhrmaster testified that he prepared the document at the request of Richardson and Williams and that he did not consider the document a necessary element of the transaction. LabCorp never executed and returned the document. It did begin sending its rent checks to 1651's new business address, which was provided in the document, at the same $41,250 monthly rental rate LabCorp had been paying under the terms of the first lease extension.

LabCorp continued to occupy 1651's building without incident until January 28, 2011. On that day, Rhonda Blair, LabCorp's Divisional Leasing Manager, sent 1651 a letter claiming that LabCorp had not agreed to the second renewal term and the lease had defaulted to a month-to-month tenancy as of July 1, 2007. Blair explained that LabCorp intended to end its tenancy of the building on February 28, 2011, which LabCorp eventually did. 1651 took the position that LabCorp's actions

breached a lease renewal agreement it entered by virtue of its December 26, 2006 letter which stated

that it "hereby exercise[d]" the second renewal option. As a result, 1651 claims LabCorp owes it rent

for the sixteen-month period between March 1, 2011 and the expiration of the alleged second lease

renewal term on June 30, 2012.

## II.

The original lease agreement provided that "[i]f the parties cannot agree upon any matter for

or about which this Lease provides, it shall be submitted to arbitration." After the disagreement over

the second lease renewal agreement arose, 1651 and LabCorp decided to litigate the matter in federal

court instead of pursuing arbitration. They executed a written agreement ("Agreement") waiving

the arbitration clause:

> 1. The Parties' present disagreement concerning the above-captioned lease (the "Dispute") shall be resolved by litigation in the United States District Court for the Western District of Kentucky ("Federal Court").

> 2. In order that the Dispute shall be resolved in Federal Court, the Parties hereby mutually and irrevocably waive their right to exercise the arbitration provision contained in paragraph 19 of the above-captioned lease as a means of resolving the Dispute.

1651 then filed suit against LabCorp in federal district court in Louisville on April 1, 2011. LabCorp

counterclaimed against 1651 to recover expenses it incurred to insure the building after vacating it.

After discovery, both sides moved for summary judgment on all claims. The district court concluded

that LabCorp had not properly exercised its renewal option and no long-term lease existed when it

vacated the premises. As a consequence of this ruling, the district court held that LabCorp was

entitled to reimbursement for insuring the building after it was no longer a tenant. It therefore

granted LabCorp's motion for summary judgment and denied 1651's motion for summary judgment.

1651 timely appealed the district court's judgment.

## III.

We begin by addressing the threshold issue of jurisdiction. LabCorp argues that the parties

waived their right to appeal the district court's judgment in the Agreement. It relies on language in

the Agreement expressing the parties' intention to "resolve[]" this dispute in "Federal Court," which

the Agreement defines as the "United States District Court for the Western District of Kentucky."

It also notes that the original lease agreement did not provide the parties a right of appeal from the

arbitrator's decision. This argument is unpersuasive.

Just as parties to civil litigation may agree to resolve a dispute out of court, they may also

consent to making a trial court's determination final and waiving their right to appeal. *See* 15A

Charles Alan Wright et al., *Federal Practice and Procedure* § 3901 (2d ed. 1992). For example, in

*In re Lybarger*, 793 F.2d 136 (6th Cir. 1986), the parties entered a settlement prior to trial that

allowed them to submit a disagreement on attorney's fees to the district court. 793 F.2d at 137. The

settlement provided that the district court's decision on attorney's fees "shall be final and the parties

waive all rights of appeal and further review of or relief from the Court's Order regarding same."

*Id.* The plaintiff nonetheless filed an appeal after the district court's ruling dissatisfied her. This

court dismissed the appeal. *Id.* at 138. Despite assertions that the district court applied the law

arbitrarily, we held that the plaintiff had "assumed the risk of an unreviewable decision" and that her

express waiver of her right to appeal was enforceable. *Id.* at 139. Our sister circuits have enforced appellate waivers similar to the one we approved in *Lybarger*.[1]

The Agreement is not an effective appellate waiver because it does not explicitly waive 1651's right to appeal. It merely expresses the parties' intent to "resolve" their dispute in federal court and to waive the arbitration clause for purposes of this dispute. *See Andersen Corp. v. Pella Corp.*, 422 F. App'x 882, 884 (Fed. Cir. 2011) (denying motion to dismiss appeal based on an agreement calling for "binding resolution" of an issue by a federal magistrate judge because the agreement did not provide a "clear and express" waiver of the right to appeal). LabCorp's argument that the Agreement must be read as a prohibition on appeal because the original lease agreement did not permit appeals from arbitration is also incorrect. The Agreement waives both parties' ability to "exercise the arbitration provision," and as a consequence, all of the standard rights available to litigants in federal court in the absence of such an agreement are available to 1651, including a right of appeal. Accordingly, we deny LabCorp's motion to dismiss and turn our attention to the merits of 1651's appeal.

---

[1]*MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 827–28 (10th Cir. 2005) ("Judgment upon the award rendered by the arbitrator shall be final and nonappealable . . . ."); *Brown v. Gillette Co.*, 723 F.2d 192, 192 (1st Cir. 1983) ("The parties agree that the determinations of the [district] Court on such claims shall be final and binding and hereby waive any and all rights of appeal with respect to such determinations."); *Goodsell v. Shea*, 651 F.2d 765, 766 (C.C.P.A. 1981) ("[T]he decision of the Board of Patent Interferences . . . shall be accepted as final and conclusive upon the parties and each party hereby waives any and all rights of appeal from any such decision . . . ."); *see also Slattery v. Ancient Order of Hibernians in Am.*, No. 97-7173, 1998 WL 135601, at *1 (D.C. Cir. Feb. 9, 1998) (dismissing appeal because parties entered a settlement agreement in which they "agree[d] not to appeal any decision by the district court relating to defendants' motion for attorneys' fees and costs").

## IV.

### A.

This court reviews a district court's order granting summary judgment *de novo*. *Taylor v. Geithner*, 703 F.3d 328, 335 (6th Cir. 2013). "The [district] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The district court "view[s] all facts and inferences drawn from those facts in the light most favorable to the nonmoving party." *Mosholder v. Barnhardt*, 679 F.3d 443, 449 (6th Cir. 2012). At this stage of the case, the district court's role "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We apply the substantive law of Kentucky in this diversity action. *Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003).

### B.

LabCorp argues that it never reached an enforceable agreement with 1651 with regard to the second lease renewal option. As a result, it asserts that the lease defaulted into a month-to-month tenancy on July 1, 2007, as provided for in the original lease agreement, and that it did not breach its lease agreement with 1651 when it vacated the premises and stopped paying rent in February 2011. We agree and affirm the district court's judgment on this basis.

An enforceable contract is formed when there is a "meeting of the minds of the parties or mutual assent to the same thing, and all material terms and conditions of the contract . . . [are] agreed

on." *McGeorge v. White*, 174 S.W.2d 532, 533 (Ky. 1943).[2] To determine what steps are necessary for the parties to manifest mutual assent when they seek to prolong a preexisting lease, we look to the language the lease uses to describe the right, the intent of the parties as manifested by other terms in the lease, and the parties' conduct before the controversy arose. *Klein v. Auto Parcel Delivery Co.*, 234 S.W. 213, 215 (Ky. 1921).

Kentucky law recognizes two basic categories of rights for prolonging a tenancy that a lease agreement may afford to a lessee. The first is a "right of renewal," which "connotes that a new, formal agreement in writing should be executed by the parties . . . or, at least, some positive act other than a mere holding over beyond the fixed term must be taken." *Lexington Flying Serv. v. Anderson's Ex'r*, 239 S.W.2d 945, 946 (Ky. 1951). The second is a "right of extension," which only requires "a holding over by the lessee" to prolong the lease; "no re-execution of the lease is required." *Klein*, 234 S.W. at 214. "Of course, if the lease prescribes a condition precedent to the exercise of the privilege by the lessee, such as the giving of notice within a specified time before the expiration of the first term, such condition must be complied with . . . whether the privilege be one 'to renew' or 'to extend' the original term." *Id.* at 215. And although there is a "technical difference" between the terms "extend" and "renew" under Kentucky law, a lease's description of the lessee's right to retain a lease as one or the other is often not, itself, dispositive. *Id.* ("[T]he technical difference [between rights to "extend" and "renew"] may be controlled by the intention of

---

[2]Prior to the creation of the Kentucky Supreme Court in 1976, the Kentucky Court of Appeals was the state's highest appellate court. This opinion will refer to decisions by the Court of Appeals prior to 1976 with the abbreviation "Ky.," and to decisions from 1976 onwards with the abbreviation "Ky. Ct. App."

the parties as manifested by something appearing in the lease, or by their conduct before the controversy arose, and . . . the privilege may thus be construed as one to 'extend' the term, although the language employed is one 'to renew' it."); *see also Kentucky Lumber Co. v. Newell*, 105 S.W. 972, 973 (Ky. 1907) ("[I]t is not so much a question of what the term [used in the lease] strictly means as what did the parties to the writing mean to express in its use.").

All signs in this case indicate that LabCorp held an "option to renew" requiring execution of a separate lease agreement in addition to the provision of notice and a holding over. The language of the original lease agreement between 1651 and LabCorp provides for an "option to renew" the lease instead of an "option to extend," suggesting the parties believed at the time of the original lease that separate agreements to prolong the lease would be needed. Although language is often not determinative in these cases, *see id.*, this understanding of the lease language is reinforced by two other features of the original lease. First, 1651 and LabCorp needed a signed writing capturing all material terms in order to make the five-year lease extensions legally enforceable under Kentucky's statute of frauds. *See* Ky. Rev. Stat. § 371.010(6) (statute of frauds applies to leases lasting longer than a year). Second, the original lease is ambiguous as to a material term of any lease renewal—the rental rate. Under Kentucky law, the parties must agree on either a rental rate or a "definite objective standard" by which that rate can be determined to form an enforceable lease agreement. *Walker v. Keith*, 382 S.W.2d 198, 200 (Ky. 1964) (emphasis removed). A "definite objective standard" means "a specific method of making the determination, such as by computation, the application of a formula, or the decision of an arbitrator." *Id.* For instance, "an appropriate method by which a non-fixed rental could be determined" would be an agreement to pay "an amount equal to one cent per

gallon of gasoline delivered to" a gas station each month. *Id.* (internal quotation marks omitted) (quoting *Jackson v. Pepper Gasoline Co.*, 133 S.W.2d 91, 92 (Ky. 1939)).

The lease agreement in this case calls for the rent to be set at "the then market rent for similar space in the Louisville area." Although this standard is somewhat more definite than an agreement to fix the rent based on "comparative business conditions" that the Court of Appeals of Kentucky rejected in *Walker*, it is still too ambiguous to qualify as a "definite objective standard." 1651 could have solved this problem by submitting the question of what constituted a "market rent" to arbitration, as the original lease agreement contemplates, but it did not do so. Because the parties never came to terms on a rental rate, LabCorp's renewal option was not enforceable until the parties reached a separate agreement that included a rental rate.

The parties' conduct also supports LabCorp's position that a separate, formal lease agreement was necessary to complete the lease extension. In 2002, the parties executed just such a document to effectuate the first lease extension. *See Tinaco Plaza, LLC v. Freebob's, Inc.*, 814 A.2d 403, 410 (Conn. App. Ct. 2003) (relying, in part, on the parties' prior execution of a signed agreement to renew a lease that "require[d] the negotiation of a new rent as a prerequisite" in order to conclude "that the lease and the amendment provided a covenant to renew that required a writing"). Likewise, the December 26 letter LabCorp sent to 1651 anticipates the execution of a formal lease extension agreement in order to complete the second lease renewal. After providing notice of its desire to exercise the second renewal option as the lease requires, the letter sets forth concerns that would impact determination of the "market rate" and anticipates the "initiation of negotiations" directed toward a "timely lease extension." Before and after LabCorp sent its December 26 letter, it made

numerous attempts to engage 1651 in discussions about the rental rate that 1651 ignored.

Finally, just before the lease expired, 1651 proposed a definite rental rate, prepared a formal renewal agreement at LabCorp's request similar to the one executed in 2002, and directed LabCorp to execute and return it to 1651. LabCorp did not return the agreement. Even though the rate 1651 proposed was the lowest provided for under the lease extension agreement, a contract is only formed when the parties manifest mutual assent on "*all* the material terms" of the contract. *Jones*, 605 S.W.2d at 42. That never occurred in this case.

Because the language used to describe LabCorp's option to prolong its lease, the relevant terms of the lease renewal provisions, and the conduct of the parties all point toward a "right of renewal," we conclude that LabCorp and 1651 needed to reach a separate written agreement to exercise LabCorp's second five-year option. Because they did not reach such an agreement, LabCorp and 1651 entered a month-to-month tenancy as provided by the original lease, which gave LabCorp the right to terminate the lease with a month's notice. Our conclusion is similar to the one the Kentucky Court of Appeals reached on similar facts in *Electronic Sales Engineers, Inc. v. Urban Renewal & Community Development Agency*, 477 S.W.2d 814 (Ky. 1972). In that case, the original lease agreement provided "an option to renew for an additional five years" and required the lessee to notify the lessors of its intent to exercise the option "at least 120 days before the expiration of the term." *Id.* at 815. The renewal option was for a period of time longer than a year and does not appear to have provided the terms on which the renewal would take place, so there was no dispute that a new written agreement between the parties was necessary. The lessee orally provided timely notice as required under the lease, and several weeks before the expiration of the lease, the lessors

provided the lessee with a formal lease renewal agreement. *Id.* The lessee failed to properly execute and return the agreement. *Id.* The Court of Appeals ruled that no lease renewal agreement had been reached, even though the lessee had properly given notice of its intent to renew, held over past the expiration of the original lease, and continued to pay rent to the lessors at the previous rental rate. *Id.* at 815–16.

1651 argues that this case is distinguishable from *Electronic Sales Engineers* because the lessee in that case only provided oral notice of its desire to exercise the option and there was no writing which evidenced the existence of the lease extension. There are a handful of Kentucky cases finding that a lessee renewed a lease merely by providing written notice of its intent to do so and holding over as a tenant. But the difference between those cases and this dispute is that the original lease agreements in those cases left no material terms regarding the renewal unsettled, including the rental rate. *See, e.g.*, *Ingram v. Lane*, 265 S.W. 434, 435 (Ky. 1924) (holding that by providing written notice of their intent to exercise a renewal option "on the same terms" as the original lease, "the parties . . . were on the same footing exactly" as if their lease had contemplated a right to extend, rather than a right to renew, and holding over was sufficient to trigger the renewal); *Kozy Theater Co. v. Love*, 231 S.W. 249, 250–52 (Ky. 1921) (agreeing that lessees had adequately exercised "privilege . . . to renew . . . under like terms" in lease contract by sending written notice of intent to lessors and holding over, despite absence of separate agreement). Notice was all that was required to bring the parties into a complete, enforceable agreement to prolong the lease. Here, the ambiguity in the original lease agreement necessitated an additional agreement.

## C.

1651's only remaining viable argument is that the December 26 letter sent by LabCorp can be construed as a separate written agreement sufficient to exercise a "right to renew" if it is read in conjunction with extrinsic evidence that resolves the letter's ambiguity about LabCorp's commitment to prolonging the lease. "Where a contract is ambiguous or silent on a vital matter . . . parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties" may be considered by the court in order to give meaning to the contract's terms. *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002). The evidence put forward by 1651 includes (1) deposition testimony from Richardson claiming that he and Williams believed they had reached a lease extension agreement and demanded broker fees from LabCorp commensurate with successful negotiation of an extension; (2) an e-mail from Braune expressing his belief that LabCorp was "already obligated for the rent," while acknowledging that LabCorp's legal department might have a different opinion on the matter; and (3) LabCorp's payment of insurance premiums on an annual basis; and LabCorp's failure to inform 1651 of its belief that it was in a month-to-month tenancy until January of 2011.

We agree with LabCorp that the December 26 letter cannot be so construed. LabCorp's December 26 letter is neither ambiguous nor silent on the issue of the rental rate, which was essential to the formation of an enforceable agreement. It mentions the need to engage in further discussions about the rental rate but does not commit LabCorp to a rate or an objective method for determining that rate. Extrinsic evidence cannot be used to create a commitment that the letter, on its face,

refuses to make.  Even if we were to consider this evidence, it is not helpful to 1651.  At most, it suggests some disagreement among LabCorp officers and agents as to the legal effect of the letter long after it was written and reflects LabCorp's own lack of awareness about what was necessary to create an enforceable lease extension.  Accordingly, we reject 1651's effort to transform the December 26 letter into the written agreement necessary to establish that it effectively renewed its lease with LabCorp.

**V.**

For the foregoing reasons, we affirm the judgment of the district court.