RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0268p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JAMIE MARQUARDT,

　　　　　　　　　　*Plaintiff-Appellant*,

*v.*

NICOLE CARLTON; CITY OF CLEVELAND, OHIO,

　　　　　　　　　　*Defendants-Appellees*.

No. 19-4223

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:18-cv-00333—Solomon  Oliver, Jr., District Judge.

Argued:  August 4, 2020

Decided and Filed:  August 19, 2020

Before:  GILMAN, BUSH, and READLER, Circuit Judges.

_____

### COUNSEL

**ARGUED:**  William C. Livingston, BERKMAN, GORDON, MURRAY & DEVAN, Cleveland, Ohio, for Appellant.  David R. Vance, ZASHIN & RICH CO., L.P.A., Cleveland, Ohio, for Appellees.  **ON BRIEF:**  William C. Livingston, Steven D. Shafron, BERKMAN, GORDON, MURRAY & DEVAN, Cleveland, Ohio, for Appellant.  David R. Vance, Patrick J. Hoban, ZASHIN & RICH CO., L.P.A., Cleveland, Ohio, William Menzalora, CITY OF CLEVELAND DEPARTMENT OF LAW, Cleveland, Ohio, for Appellees.

_____

### OPINION

_____

CHAD A. READLER, Circuit Judge.  While employed as a captain in the Cleveland Emergency Medical Services (EMS), Jamie Marquardt allegedly made incendiary comments on

his private Facebook page regarding the death of twelve-year-old Tamir Rice, a tragic incident that gripped Cleveland and the nation. Following his dismissal from the EMS, Marquardt brought suit alleging he was terminated in retaliation for exercising his First Amendment free speech rights. Because Marquardt's social media posts addressed a matter of public concern, the district court erred in granting summary judgment on that basis. Accordingly, we **REVERSE** the judgment below and **REMAND** for further proceedings consistent with this opinion.

**BACKGROUND**

Among the fundamental protections preserved by the First Amendment, our right to speak freely on public issues falls on the "highest rung of the hierarchy of First Amendment values." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)). Jamie Marquardt, a captain with the Cleveland EMS, alleges this threshold right was violated when the City of Cleveland terminated his employment based upon speech posted to his personal Facebook page.

The Facebook posts, all agree, did not identify Marquardt as a City employee, nor were they made during work hours. Nor would one likely dispute their controversial nature. The posts related to an incident that made local and national headlines: the shooting death of Tamir Rice. As the many who followed this fatal episode are well aware, Cleveland officers received an alert that a male was purportedly pointing a gun at people at a Cleveland recreation center. When officers responded to the scene, they shot and killed the suspect. The suspect turned out to be twelve-year-old Tamir Rice. And the "gun" he was alleged to possess was just a toy. Vigils and protests followed, questioning this use of lethal force.

The events at issue today unfolded some fourteen months later, when a disturbing post appeared on Marquardt's private Facebook page. Although Marquardt contends he did not author the post, there is little dispute that the content on his Facebook page expressed satisfaction at Rice's killing:

> Let me be the first on record to have the balls to say Tamir Rice should have been shot and I am glad he is dead. I wish I was in the park that day as he terrorized innocent patrons by pointing a gun at them walking around acting bad. I am upset I did not get the chance to kill the criminal fucker.

Someone by the name of Kevin, apparently one of Marquardt's cousins, posted a comment in reply. A second post then appeared on Marquardt's page:

> Stop Kevin. How would you feel if you were walking in the park and some ghetto rat pointed a gun in your face. Would you look to him as a hero? Cleveland sees this felony hood rat as a hero . . .

The posts were visible only to those whom Marquardt had added as a "friend" on the Facebook platform.

Marquardt removed the posts within hours. And he later claimed an acquaintance with access to his phone made the posts while he slept. Yet the posts quickly became a subject of discussion among Marquardt's EMS colleagues. After various EMS employees expressed concern over the jarring content of the posts, EMS Commissioner Nicole Carlton cited the posts in a complaint filed with the City of Cleveland. A hearing was held to determine whether Marquardt had violated the City's social media policies. Two weeks later, Carlton notified Marquardt that he had been terminated by the City. The termination letter advised Marquardt that his speech violated City policies and "did not involve a matter of public concern."

Marquardt responded by filing suit under 42 U.S.C. § 1983. As relevant here, he alleged he was terminated by the City in retaliation for his protected speech in violation of the First and Fourteenth Amendments. Concluding that the posts amounted to speech on a matter of private interest, and not of public concern, the district court granted summary judgment to Defendants, and later denied Marquardt's request to alter or amend the judgment. Marquardt then filed this timely appeal.

## ANALYSIS

Marquardt appeals both the district court's grant of summary judgment to Defendants and its denial of Marquardt's motion to alter or amend that judgment. Ordinarily, we review the entry of summary judgment de novo, and employ a more deferential standard—abuse of discretion—when reviewing a motion to alter or amend the judgment. But because Marquardt's motion sought reconsideration of the district

court's grant of summary judgment, we review both that decision and the underlying summary judgment decision under the same de novo standard. *Hansmann v. Fid. Invs. Instit. Servs. Co.*, 326 F.3d 760, 766–67 (6th Cir. 2003). In so doing, we draw all reasonable inferences in Marquardt's favor, and, in that favorable light, determine whether Defendants have carried their burden to show that the evidence is insufficient to establish a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1).

With these standards in mind, we turn to Marquardt's speech-based retaliation claim. To assess whether a public employer impermissibly retaliated against an employee for his speech, we ask three questions: one, whether the employee engaged in protected speech; two, whether the action taken against the employee would discourage an individual of "ordinary firmness" from engaging in the activity that led to his discipline; and three, whether the employee's protected speech was "a motivating factor" behind the adverse action taken against the employee. *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 337 (6th Cir. 2010). The first in this series raises further questions of its own. For in resolving whether the employee engaged in protected speech, we employ a separate two-part test. We ask first whether the speech was on a "matter of public concern," and if it was, we balance the interests of the employer and employee, asking whether the "employee's free speech interests outweigh the efficiency interests of the government as an employer." *Rorrer v. City of Stow*, 743 F.3d 1025, 1047 (6th Cir. 2014); *see also Handy-Clay v. City of Memphis*, 695 F.3d 531, 544 (6th Cir. 2012).

Part one of this two-part inquiry is the lone issue before us. Defendants concede that Marquardt's Facebook post was not made pursuant to his employment, but instead as a private citizen. And the parties have not briefed, nor did the district court pass upon, how to balance the interests of Marquardt and the Cleveland EMS, his former employer.

*The speech on Marquardt's Facebook page addressed a matter of public concern.* The district court concluded that the speech published through Marquardt's Facebook page related to the author's personal interest in Rice's death, not to a matter of public concern. Speech involves a matter of public concern when it can be "fairly considered as

relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. To resolve the public/private distinction, we look to the "content, form, and context of a given statement, as revealed by the whole record." *Mosholder v. Barnhardt*, 679 F.3d 443, 449–50 (6th Cir. 2012) (quoting *Connick*, 461 U.S. at 147–48). And in undertaking that analysis, we set aside the shocking and no doubt painful aspects of Marquardt's comments. For whether speech is shocking or inappropriate is irrelevant to whether it concerns a public matter. *See Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

We begin with the content of the Facebook posts. The posts were written against the backdrop of the fatal police shooting of Tamir Rice fourteen months earlier. The shooting set off a fierce public debate over whether the officers' actions were justified, a debate that only intensified when, not long before the posts on Marquardt's Facebook page, a grand jury declined to indict the officer who shot Rice. Ashley Fantz, *Tamir Rice Shooting: No Charges For Officers*, CNN (Dec. 28, 2015), https://www.cnn.com/2015/12/28/us/tamir-rice-shooting/index.html (last accessed July 26, 2020). And just days before those posts appeared, the incident's aftermath again made national news when Cleveland was found to have billed Rice's family for his ambulance ride, a decision for which the City later apologized. Christine Hauser, *Cleveland Drops Attempt to Collect $500 From Tamir Rice Family*, N.Y. Times (Feb. 11, 2016), https://www.nytimes.com/2016/02/12/us/cleveland-500-bill-tamir-rice-shooting.html (last accessed July 26, 2020).

The ensuing posts on Marquardt's Facebook page made certain assertions about the well-documented shooting that plausibly relate to the officers' handling of the encounter and the resulting community reaction. In the posts, the author seems to assert that Rice's shooting was justified because he was "terroriz[ing]" people by pointing a gun at them. The posts also assert that Rice, due to his conduct at the time of the killing, should not be viewed as a hero by Clevelanders. Given the widespread local and national scrutiny of the Rice shooting, these aspects of the posts directly relate to a "subject of general interest and of value and concern to the public." *City of San Diego v. Roe*, 543

U.S. 77, 84 (2004) (per curiam). Just as incendiary comments following a "news bulletin" of a presidential assassination attempt were on a matter of public concern, so too were the comments here addressing the propriety of a high-profile shooting. *See Rankin*, 483 U.S. at 386.

Of course, the posts in question said a good deal more. Intermixed with profanity and racially insensitive language was an expression of pleasure at Rice's death. The poster even lamented the fact that he was not the one to kill Rice. True, these details, which reflect (per the district court) "the author's desire to kill a twelve-year-old boy," as well as the author's "joy that [Rice] is already dead," might not strike one as matters of public concern. Yet these disturbing first-person sentiments do not, as a matter of law, alter the broader subject of the speech or transform it into a "personal grievance." The First Amendment is not so fragile that its guarantees rise or fall with the pronouns a speaker selects. And expressions of opinion, even distasteful ones, do not become matters of personal interest simply because they are phrased in the first person or reflect a personal desire. *See, e.g.*, *Rankin*, 483 U.S. at 381 (holding that an employee's statement to a co-worker that, "if they go for him again, I hope they get him," in reference to the assassination attempt on President Reagan, was speech on a matter of public concern).

Our caselaw confirms this conclusion. Consider first *Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004). There, we considered the firing of a school custodian who had a long history of disciplinary issues. In nearly every instance of discipline, the custodian would respond to the official imposing the discipline with verbal or written insults and threats. *Id.* at 585. One letter, which ultimately resulted in the custodian's termination, also included conclusory comments about his discipline being in retaliation for his exposure of union corruption. *Id.* at 586. Following his termination, the custodian alleged his firing was in retaliation for his expressed opinions purportedly on matters of public concern. Emphasizing the need to consider the overall "point" or "focus" of the speech in question, we held that the custodian's "passing" and conclusory references to corruption were not enough to turn a "personal beef" related to his employment into a matter of public concern. *Id.* at 592–93.

But the posts on Marquardt's account were more than a "personal beef." Their focus, as distasteful and unpopular as it might be, was that Rice, by then a familiar name to the public, deserved to be shot because he was waving a gun at other people. *See Evans-Marshall*, 624 F.3d at 339 (noting that whether "large segments of the community disagreed" with the speech was not relevant to the public-concern inquiry, which instead asks whether the topic is "'of concern' to the community" (quoting *Connick*, 461 U.S. at 146)). Instead of commenting on a personal grievance, the poster remarked on a "subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (describing a "subject of legitimate news interest"); *see also Roe*, 543 U.S. at 84. Said differently, the posts addressed a "subject" one could envision "stepping up to the microphone" to discuss in the traditional public square. *See Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1188 (6th Cir. 1995) (quoting *Dambrot v. Central Mich. Univ.*, 839 F. Supp. 477, 487 (E.D. Mich. 1993)).

Nowhere is there any suggestion that Marquardt (or whomever made the posts) was impacted personally or professionally by the Rice shooting. To be sure, Marquardt was employed by the Cleveland EMS, and that unit had a role in responding to the Rice shooting. But there is no allegation that Marquardt was personally involved in that response. And even if the more extreme excerpts from the posts could somehow be construed as involving matters of personal interest, the "public concern/private interest analysis does not require that a communication be utterly bereft of private observations or even expressions of private interest." *Mosholder*, 679 F.3d at 450–51 (citing *Perry v. McGinnis*, 209 F.3d 597, 609 (6th Cir. 2000)); *see also Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011) (holding that it is not "necessary for the entire expression to address matters of public concern, as long as some portion of the speech does" (citation omitted)). Rather, the relevant question is whether the communication "touches 'upon matters *only* of personal interest.'" *Mosholder*, 679 F.3d at 450 (quoting *Connick*, 461 U.S. at 147). And here, the content is not so narrowly confined.

Next, the form of the speech. The speech here came by way of a post on Marquardt's Facebook account. This form of expression also cuts in favor of deeming

the speech as addressing a matter of public concern. Yes, the Facebook posts were visible only to Marquardt's friends. But speech need not be communicated to the general public to be on a matter of public concern. *See Handy-Clay*, 695 F.3d at 544. Keep in mind that the very genesis behind Facebook and other social media platforms is to allow one the opportunity to share messages and opinions with a wide audience. That reality, in fact, has made social media perhaps the primary venue for exchanging ideas on public issues. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017) (referring to social media as "the modern public square"). Whether one's public expression comes from the ink of a quill pen, the stroke of a keyboard, or the tapping of an iPhone, that expression is entitled to First Amendment protection under the same strictures. *See id.* at 1735–36.

Finally, we look to the context. But in today's case, this consideration is less revealing because much of the context surrounding the two Facebook posts is missing. The first was an original writing on Marquardt's account; the second was part of a conversation with someone who commented on the original post. Marquardt says the posts were made by an unidentified acquaintance who stayed at his home. He also says he deleted the posts, and any accompanying comments, as soon as he discovered them. We thus do not know what prompted the posts, nor do we know the substance of the reply to the initial post, other than to believe that the reply apparently disagreed with the initial post about Rice.

Albeit limited, the known context gives no indication that the speech concerned primarily a matter of Marquardt's personal interest. Whether the posts were spontaneous expressions or long-developed ideas, their substance still reflects matters of public concern because they relate to a "matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. That fairly describes the circumstances surrounding the Rice shooting, which generated intense public debate and quickly became a matter of public discussion. As the posts touch on these same issues, they too address a matter of public concern.

Defendants counter that Marquardt was terminated for only the portion of the posts expressing regret that the author was not able to kill Rice himself. That assertion, however, is at odds with their answer to Marquardt's complaint, where Defendants admitted Marquardt's allegation that he was terminated for both posts in their entirety. And to the extent there is fair debate on the question, we are required at summary judgment to draw all reasonable inferences in Marquardt's favor. *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016). We thus consider the speech—as the district court did—as a whole.

Looking to that speech, it might be, as Defendants also suggest, that "restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). But the death of Tamir Rice was no private matter. As the reasoning in *Snyder* demonstrates, bitter and offensive personal opinions may still touch upon matters of public concern. In *Snyder*, the Supreme Court held that picketers at a military funeral were speaking on a matter of public concern by wielding signs saying "God Hates the USA/Thank God for 9/11," "Thank God for IEDs" (or "improvised explosive devices," often in the form of roadside bombs that would severely injure or kill soldiers), "God hates fags," "You're Going to Hell," and "God Hates You." *Id.* at 448. If those expressions—which arguably express glee at the death of a rank-and-file soldier— involve matters of public concern, so too does the speech here. *See also Grutzmacher v. Howard County*, 851 F.3d 332, 338, 343 (4th Cir. 2017) (holding a police officer's social media statement referring to "beating a liberal to death with another liberal" was speech on a matter of public concern because his post related to the topic of gun control).

Defendants' reliance on *Dambrot* does not change our conclusion. 55 F.3d at 1187. There, a basketball coach repeatedly used an offensive racial slur during team meetings to try and motivate his players. *Id.* at 1180. We held that the coach's speech did not touch upon a matter of public concern. *Id.* at 1189. But locker-room talk used to motivate individual basketball players is a far cry from utilizing social media to address an event that garnered local and national attention. Although perhaps of utmost interest

to a team's diehard fans, the issue of whether "[the coach's] players needed to play harder" is not otherwise a matter of importance to the broader public. *Id.* at 1190. And unlike a Facebook post addressing a newsworthy topic, coaches do not normally speak to their players as a way to gin up debate, nor is the locker room akin to a marketplace of free expression. *Id.*

*     *     *     *     *

Other than resolving the "public concern" question, our decision today is narrow. We do not decide any other aspect of Marquardt's free speech claim, including whether the posts on his Facebook page amount to protected speech. In resolving this latter question, the district court will need to address whether Marquardt's free speech interests outweigh the interest of the Cleveland EMS in the efficient administration of its duties. *See Rorrer*, 743 F.3d at 1047. On that issue, we note the well-settled rule that the government, when acting as an employer, may regulate employee speech to a greater extent than it can that of private citizens, including to discipline employees for speech the employer reasonably predicts will be disruptive. *See Waters v. Churchill*, 511 U.S. 661, 671–73 (1994).

*Remaining considerations on remand.* Two remaining matters deserve mention. One, on the basis of its dismissal of Marquardt's free speech claim, the district court also dismissed his failure-to-train claim against the City of Cleveland. Because we reverse the former, we likewise reverse the latter, leaving both claims for further consideration as the case progresses.

Two, the district court granted Defendants' motion for costs, due to their prevailing-party status. *See* 28 U.S.C. § 1920; Fed. R. Civ. P. 54(d). That decision too must be reversed. *See Green Party of Tenn. v. Hargett*, 767 F.3d 533, 552 (6th Cir. 2014). The district court had previously dismissed three of Marquardt's claims as time barred, and that determination, along with the grant of summary judgment to Defendants on Marquardt's free speech and failure-to-train claims, meant Defendants had prevailed on most of the seven counts raised in the complaint. But the district court had already

ruled for Marquardt as to the overbreadth of the City's social media policy and his request for injunctive relief as to that policy. Those rulings, along with our decision today, necessitate further consideration of Marquardt's other request for injunctive relief, and undermine the district court's previous rationale for granting costs to Defendants. We thus leave these issues as well for further development, as the case proceeds.

**CONCLUSION**

Based upon the foregoing, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.