NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0463n.06

Nos. 16-6346, 16-6347

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| RODDY LYLES, Executor of the Estate of Pat Lyles, JANICE N. COPE, CHARLES S. STORY, and CINDY STORY (16-6346); WILLIAM RALPH CLIFT, CLINTON CLIFT, JR., BARBARA CLIFT, and JUDITH BENNETT CLIFT (16-6347), | ) ) ) ) ) ) | **FILED** Aug 08, 2017 DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| RDP COMPANY; LAFARGE WEST INCORPORATED, | ) ) ) | |
| Defendants-Appellees (16-6346/6347), | ) ) | |
| MARTIN MARIETTA MATERIALS, INC., | ) ) | |
| Third Party Defendant-Appellee (16-6346/6347), | ) | |

BEFORE: GIBBONS, COOK, and GRIFFIN, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Between 1967 and 1977, two families—the Storys and the Clifts—entered into a series of mineral leases with Fredonia Valley Quarries, Inc. (FVQ). The leases allowed FVQ to quarry limestone from the Story and Clift properties in Caldwell County, Kentucky. The operative leases were subsequently assigned to the RDP Company (RDP) and quarry operations were subleased to Lafarge West, Inc. Beginning in 2013—more than thirty-five years after the most-recent leases were executed—the Storys and Clifts stopped accepting royalty payments from RDP. The families then brought independent actions, now consolidated on appeal, raising numerous claims against RDP and Lafarge and

seeking a declaration that the operative leases are no longer valid. Because these claims are either waived or without merit, we affirm the district court's grant of summary judgment to defendants and deny the pending appellate motion to dismiss as moot.

I.

A.

At some point prior to 1967, FVQ established a limestone quarry in Caldwell County, Kentucky. FVQ expanded the quarry throughout the 1960s and 1970s by entering into mineral leases with adjacent landowners, including the Storys and the Clifts. By January 1986, however, the quarry was in a state of disarray and on the verge of closing. At this point, the quarry and all associated leases were assigned to Rock Dust Products, a general partnership, in exchange for $450,000. The partnership immediately invested approximately $2 million to make the quarry operational and then ran the quarry for the next eleven years, reinvesting all net income into quarry operations.

In 1997, Rock Dust Products assigned the quarry leases to RDP, a business trust. RDP immediately subleased its rights in the quarry to Martin Marietta Materials, Inc. In exchange, Martin Marietta agreed to pay RDP a gross royalty of 30.33¢ per ton of limestone removed until April 30, 2007, the greater of 30.33¢ or 4.5% of Martin Marietta's average retail price per ton removed between April 30, 2007, and April 30, 2027, and the greater of 30.33¢ or 4.0% of Martin Marietta's average retail price per ton removed after April 30, 2027. RDP remained responsible for paying rents, royalties, taxes, and other charges associated with the quarry. In December 2011, Martin Marietta assigned its sublease to Lafarge West Inc. Lafarge continues to operate the quarry today.

In order to remove limestone from the quarry, Lafarge must drill and blast stone from the quarry walls. Normally, this loose stone is immediately processed through a machine known as a primary crusher. Large boulders, however, must be broken down further before they can be run through the crusher. Lafarge keeps these boulders in the quarry—segregated by lease—for anywhere from six to twenty-four months until there are enough to justify the expense of the equipment required to break them down. After the boulders are broken down, Lafarge runs them through the primary crusher and pays out royalties on the resulting limestone.

B.

1.

In 1967, Jewell Story executed a lease granting FVQ the right to "all the merchantable limestone rock and other kindred substances in, under and upon" a 132.4 acre tract of land that he owned in Caldwell County, Kentucky. DE 81-4, Page ID 1969. FVQ agreed to pay Story 5¢ per ton for the first 2,000 tons, and 3¢ for each additional ton, of limestone removed from the property each month, with a guaranteed minimum monthly royalty of $40. If FVQ installed certain facilities on the property, Story was entitled to an additional $150 per month. Story retained the right to "all cedar timber on the premises," so long as removing that timber did not interfere with quarry operations. *Id.* at 1971. The lease had a five-year term with an option for additional five-year terms if FVQ "well and truly kept and performed" the "stipulations, covenants and agreements" in the lease. *Id.* FVQ could terminate the lease at the end of any month by written notice and a $250 payment. Story could declare a "forfeiture" if FVQ failed to make royalty payments for six consecutive months. When Jewell Story died in 1970, he devised his interest in the lease to his children: Charles Story, Janice Cope, and Pat Lyles. In 1972, the children and their spouses signed a second lease with FVQ that mirrored the 1967 lease's terms.

In 1977, FVQ sought to standardize its outstanding leases. The parties entered into a third lease, dated August 1, 1977, that again granted FVQ the right to "all the merchantable limestone rock and other kindred substances in, under and upon" the same tract. 5:14-cv-21 DE 81-4, Ex. C, Page ID 1979. FVQ also received:

> the right and license to enter upon the premises . . . at all times and to use so much of the surface thereof as may be reasonably necessary in searching for and exploring for limestone rock and other kindred substances and in determining the thickness thereof, and for the establishment of Quarries and Quarry building and for the deposit of waste material from such quarries; also the right and license to quarry and remove said limestone and/or kindred substances from said premises together with the rights, privileges, license and easements necessary, incidental or in any manner appertaining to the proper prosecution of the business of quarrying and removing said limestone and other kindred substances; also the right of way for necessary roads and railroads over said premises, and the right to occupy so much of the surface of said premises as may be reasonably necessary for the storing of said limestone rock or other kindred substances, and depositing the refuse therefrom, and the right to erect on said premises such buildings, structures and fixtures as may be necessary or incidental to the proper prosecution of said business of quarrying.

*Id.* at 1980. FVQ agreed to pay 7.5¢ per ton for the first 4,000 tons of limestone removed and 4.5¢ per ton for each additional ton removed per month, with a guaranteed minimum monthly royalty of $40 from May through November and a conditional minimum of $40 from December through April if the quarry was operating. The Storys retained the "right to all timber cut by [FVQ] on the premises in the course of operation" and FVQ promised to "deliver to the [Storys] at the Quarries, fifteen ton[s] (15) of agricultural lime each year . . . free of any cost to the [Storys]." *Id.* at 1981. Although the initial lease term was five years, it provided that:

> if all the stipulations, covenants and agreements herein contained have been well and truly kept and performed by [FVQ] as herein provided, this lease may be renewed according to the terms hereof and for the same consideration for five (5) additional years and at intervals of five (5) years thereafter for a period not exceeding ninety nine (99) years, and so long as said conditions have been kept and performed.

*Id.* The lease provided only one other avenue for termination: the Storys could declare a forfeiture should FVQ fail to operate the quarry or pay royalties for ninety days.

2.

Charles Story, who is Jewell's son and a signatory to the 1977 lease, has lived on the family's Caldwell County property since 1957. He began farming the property in 1995 and continues to farm the approximately ninety acres of unquarried land today. Although the quarry is only a half-mile from Story's house, he cannot see it due to a rise in the land. However, he has visited the quarry at least once a month for years and estimates that he has made hundreds of visits since the 1977 lease was signed.

Story admits to knowing that his land has been used in connection with quarrying operations on other properties for twenty to twenty-five years. He watched quarry employees collect topsoil and waste rock from adjacent properties and store it on his. Similarly, he witnessed the construction and use of haul roads on his land to support quarry operations elsewhere. Although Story initially complained about these practices to Vernon Gilliand, the quarry manager, Story did not take any further action when Gilliand refused to alter quarry operations. And there is no indication that Story complained when an office building, parking lot, communication tower, and set of scales were constructed more than fifteen years ago.

Lafarge continues to use the Story property to support its broader quarrying operation. It stores topsoil and waste rock from other properties, hauls stone, and operates an office on the Story property. In 2012, the Storys retained an attorney who complained to Lafarge about this use of the property. But the Storys continued to receive and cash royalty checks from RDP through August 2013. Although they still receive checks today, they stopped cashing them in September 2013.

In 2013, Lafarge notified Charles Story that it needed to clear approximately twelve oak trees with an estimated value of $1,000. Story was given an opportunity to clear the trees but "couldn't get to it" within Lafarge's specified time frame. When Story did not remove the trees, Lafarge completed the task.

C.

1.

In 1967, Clifton Clift, Sr., and Margaret Clift granted FVQ the right to "all the merchantable limestone rock and other kindred substances in, under and upon" a 72.3 acre tract of land in Caldwell County. 5:14-cv-57 DE 84-2, Page ID 1620. FVQ agreed to pay 5¢ per ton for the first 2,000 tons, and 3¢ for each additional ton, of limestone removed from the property each month, with a minimum royalty of $50 per month and $500 for each acre that was excavated. The Clifts retained the right to "remove all timber, and buildings from said premises thirty days before quarry operations begin." *Id.* at 1621. The lease had a five-year term with an option for additional five-year terms if FVQ "well and truly kept and performed" the "stipulations, covenants and agreements" in the lease. *Id.* at 1622. FVQ could terminate the lease at the end of any month by written notice and a $250 payment. The Clifts could declare a "forfeiture" if FVQ failed to pay the minimum royalty for six consecutive months. *Id.* Five years later, in 1972, Clifton, Sr., and Margaret executed a second lease with FVQ that mirrored the terms of the 1967 lease.

Clifton, Sr., and Margaret executed a third lease with FVQ in August 1977. This lease again granted FVQ the right to "all of the merchantable limestone rock and other kindred substances in, under and upon" the same 72.3 acre tract. 5:14-cv-57 DE 84-4, Page ID 1628. The 1977 Clift lease was, in almost every way, identical to the 1977 lease that FVQ executed

with the Storys. *See* Section I.B.1, *supra*. The only substantive difference was that the Clifts were guaranteed a minimum royalty of $50 per month.

2.

Members of the Clift family have farmed the property they lease to FVQ since at least 1977. When Clifton, Sr., died in 1988, he devised the property to his sons, William Clift and Clinton Clift, Jr. William and his wife, Judith, subsequently conveyed their entire interest, except for a one-half interest in the minerals and limestone, to Clifton, Jr., and his wife, Barbara. William and Judith's son, William, II, continues to farm the undisturbed portion of the property.

Lafarge did not begin using the Clift property in earnest until sometime after 2011. However, approximately a quarter acre of the property was quarried sometime prior to 1998 and 10,000 to 25,000 tons of raw material was removed. It does not appear that the Clifts were compensated for this material.

The Clift property was otherwise undisturbed until at least 2012, when Lafarge began building an access road on the land. It is unclear whether Lafarge removed any trees in the process of building this road and, if so, whether the Clifts received notice prior to the trees being removed.[1]

The Clifts regularly cashed royalty checks until January 2014. They concede that, prior to January 2014, no one notified FVQ, RDP, Martin Marietta, or Lafarge of the Clifts' belief that the 1977 lease had not been renewed. Lafarge began quarrying the Clift property in April 2015.

---

[1] The Clifts argue, on the basis of an aerial photograph, that timber was necessarily removed to make way for the access road. This is alleged to have occurred prior to January 2014, when Lafarge notified the Clifts of its need to remove timber as they expanded quarrying operations onto the property. RDP's brief supports the Clifts' argument, stating that Lafarge "cleared a stand of trees to make way for the access road." No. 16-6347, CA6 R. 33, at 9. And although the Clifts fail to cite it, their expert's testimony suggests that timber was cut in anticipation of the access road. At the same time, there is some evidence that Lafarge provided the Clifts with notice prior to removing the timber for the road. Mark Champion, a Lafarge manager, testified that he discussed the need to remove timber from the property with William in 2013.

II.

In December 2013, Charles and Cindy Story, Janice Cope, and Pat Lyles[2] (collectively, the Storys) sued RDP, Martin Marietta, and Lafarge in Caldwell Circuit Court. The Storys alleged that Martin Marietta and Lafarge had been unjustly enriched and that RDP was liable for surface destruction, statutory waste, willful trespass, ejectment, and breach of contract. They also requested an accounting of their royalty payments and declarations that RDP had forfeited its rights under the lease, that the lease was void or should be reformed on account of its unconscionability, that the lease constituted an unreasonable restraint on alienation, and that RDP was a holdover tenant under Kentucky law. Defendants removed the case to federal court. The court subsequently granted Martin Marietta's motion to dismiss for failure to state a claim.

In March 2014, William, Judith, Clinton, Jr., and Barbara Clift (collectively, the Clifts) sued RDP and Lafarge in Caldwell Circuit Court. After timely removing the case to federal court, the Clifts filed an amended complaint alleging trespass, willful trespass, and statutory waste. They also sought ejectment and a judgment that the lease was unconscionable. Finally, they requested a declaration of the respective rights of the parties under the lease. RDP filed a counterclaim, seeking a declaration of its rights under the 1977 lease.

RDP and Lafarge filed crossclaims against each other in both the Story and Clift suits. RDP also impleaded Martin Marietta in both cases, asserting indemnity on account of Martin Marietta's breach of contract, negligence, gross negligence, and willful misconduct with respect to the Story and Clift claims.

On cross-motions for summary judgment, the district court found for RDP and Lafarge in both cases. The district court also granted Martin Marietta summary judgment as to RDP's third-party claims. Both the Storys and the Clifts filed timely notices of appeal. When RDP did not

---

[2] Roddy Lyles, acting as the executor for the estate of his father, Pat, was subsequently added to the case.

file cross-appeals as to its third-party claims, Martin Marietta filed motions seeking dismissal from this consolidated appeal.

## III.

We review a district court's grant of summary judgment *de novo*. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We construe all reasonable inferences in favor of the nonmoving party, *Ramsey v. Penn Mut. Life Ins. Co.*, 787 F.3d 813, 818 (6th Cir. 2015) (citation omitted), and ask whether the evidence—viewed in the light most favorable to the nonmoving party—presents a question of fact sufficient to require submission to a jury, or whether it is so one-sided that the moving party must prevail as a matter of law, *Martin Cty. Coal Corp. v. Universal Underwriters Ins. Co.*, 727 F.3d 589, 593 (6th Cir. 2013) (citation omitted).

## IV.

We begin by addressing the Storys' claim that RDP and Lafarge are liable for using the Story property in ways not contemplated by the 1977 lease. The claim is one of overuse. The Storys assert that the lease did not allow defendants to use the Story property to support quarrying operations on property that the Storys did not own. Although they initially pled this overuse claim as both a breach of the lease and unjust enrichment, the district court, applying Kentucky Law, construed it as a tort action for trespass. The district court agreed that RDP and Lafarge had exceeded their rights under the 1977 lease but concluded that both were entitled to a prescriptive easement because the overuse had been continuous and hostile for more than fifteen years.

On appeal, the Storys maintain that this overuse constitutes a breach of the lease. Alternatively, they dispute the presence of a prescriptive easement.  RDP and Lafarge do not contest the allegations regarding their use of the property.  Instead, they argue that such use did not violate a condition of the lease, that the Storys are estopped from asserting a claim for breach, and that any trespass is excused on account of a prescriptive easement.

As an initial matter, the Storys have not shown how defendants' overuse of the property can support a breach-of-contract claim under Kentucky law.  As the district court recognized, Kentucky has previously interpreted such overuse claims as sounding in trespass.  *Wright v. Carrollton Gravel & Sand Co.*, 242 S.W.2d 751, 752 (Ky. 1951); *Carmichael v. Old Straight Creek Coal Corp.*, 22 S.W.2d 572, 575–76 (Ky. 1929).  The Storys cannot point to any part of the 1977 lease that expressly prohibits RDP and Lafarge from using the property in connection with quarrying on other lands.  The only way to establish breach, then, is to accept the proposition that the lease's silence necessarily bars such extraneous activity—that is, activity not contemplated under its express terms.  We are not aware of any Kentucky court that has endorsed this view.  Thus, we agree that this claim sounds more properly in tort than in contract.

We thus consider whether the Storys have a valid trespass claim regarding the alleged overuse.  In Kentucky, a trespass is excused when the trespasser acquires a prescriptive easement through "adverse use" that is "actual, open, notorious, forcible, exclusive . . . hostile[,]" and continuous for "at least fifteen years."  *Cole v. Gilvin*, 59 S.W.3d 468, 475 (Ky. Ct. App. 2001) (quoting *Jackey v. Burkhead*, 341 S.W.2d 64, 65 (Ky. 1960)).  "Continuous, uninterrupted use . . . without interference for 15 years or more raises a presumption the use was under a claim of right and the burden shifts to the opposing landowner to present evidence to rebut the presumption showing it was merely permissive."  *Id.* (citations omitted).  If the use was

permissive at its inception, however, neither a prescriptive easement nor a claim of right can arise unless there has been "some distinct and positive act" asserting such a right that is "made clearly known" to the opposing landowner. *Id.* at 475–76 (citations omitted).

The Storys argue that a prescriptive easement is precluded because the 1977 lease granted RDP permission to use their property. This is in direct conflict with their claim that defendants' overuse constitutes "[t]he most egregious breach of the terms of the [1977 lease.]" 16-6346 CA6 R. 24, at 28–36. The Storys cannot have it both ways. Either they granted RDP permission to use their property in conjunction with quarrying other lands in the 1977 lease—eliminating RDP's ability to acquire a prescriptive easement but precluding the Storys' claim for breach and trespass—or they did not grant RDP such permission—thereby preserving the Storys' claim for breach but allowing defendants to assert a prescriptive easement as a defense to the trespass claim. We need not attempt to intuit the Storys' intended position. So long as RDP and Lafarge are entitled to a prescriptive easement, the Storys' claim fails under either scenario.

RDP and Lafarge have been using the Story property to support their broader operations and to haul and store material from other properties openly and continuously for more than fifteen years. Charles Story has known of such use for at least twenty years, admits to objecting "not too long" after RDP started these practices, and concedes that Gilliand refused to adjust RDP's practice, asserting that the company could "do what [it] want[ed] to do." 5:14-cv-21 DE 77-3, Story. Dep., Page ID 1543–46. Because defendants continued with their overuse for more than fifteen years after Story's first and only objection and because there is no other evidence of permission in the record, we hold that defendants are entitled to a prescriptive easement. Thus, any trespass claim necessarily fails.

V.

The Storys and Clifts also seek declarations that their leases with RDP are no longer valid, making RDP and Lafarge nothing more than holdover tenants.  They present two arguments in support of this conclusion.  First, they assert that the 1977 leases require a new writing every five years.  Second, they assert that defendants failed to comply with the conditions of the 1977 leases, thereby precluding any opportunity for renewal.  Both arguments are without merit.  RDP has a right to extend both leases in five-year increments through 2076 without providing notice or executing a new writing.  And both RDP and Lafarge have largely complied with the terms of the 1977 leases.  To the extent they have not done so, those claims are forfeited.

A.

Kentucky recognizes two contractual rights through which a tenant can continue under the terms of a lease:  the right to renew and the right to extend.  *1651 N. Collins Corp. v. Lab. Corp. of Am.*, 529 F. App'x 628, 633 (6th Cir. 2013).  The right of renewal "connotes that a new, formal agreement in writing should be executed by the parties . . . or, at least, some positive act other than a mere holding over beyond the fixed term must be taken[.]"  *Lexington Flying Serv. v. Anderson's Ex'r*, 239 S.W.2d 945, 946 (Ky. 1951).  The right to extend requires less:  A tenant need only hold over to continue under the lease for an additional term; "no re-execution of the lease is required."  *Klein v. Auto Parcel Delivery Co.*, 234 S.W. 213, 214 (Ky. 1921); *see also Lexington Flying Serv.*, 239 S.W.2d at 946.  Regardless of whether a lease provides for renewal or extension, it can "prescribe[] a condition precedent to the exercise of the [renewal or

extension] by the lessee[.]" *Klein*, 234 S.W. at 215.[3] Such conditions "must be complied with" regardless of the right to be exercised. *Id.*

Although Kentucky recognizes a "technical difference" between the terms "renew" and "extend," *1651 N. Collins Corp.*, 529 F.App'x at 633 (citation omitted), it also recognizes "that parties to the lease do not always select the exact words necessary to express their agreement, nor are they always aware of the strict, legal significance of the words used[,]" *Lexington Flying Serv.*, 239 S.W.2d at 946. Accordingly, whether a lease provides the right to renew or extend "may be controlled by the intention of the parties as manifested by something appearing in the lease, or by their conduct before the controversy arose[.]" *Klein*, 234 S.W. at 215. "[T]he privilege may thus be construed as one to 'extend' the term, although the language employed is one 'to renew' it." *Id.*; *Lexington Flying Serv.*, 239 S.W.2d at 947 ("[T]he word 'renew' will not be given its strict legal interpretation, unless it is evident from some provision of the lease, or from the conduct of the parties that the word was not used as a synonym for the word 'extend[.]'"); *see also 1651 N. Collins Corp.*, 529 F. App'x at 633.

The 1977 Story lease and the 1977 Clift lease both provide that "if all the stipulations, covenants and agreements herein contained have been well and truly kept and performed . . . this lease may be renewed[.]" 5:14-cv-21 DE 81-4, Page ID 1981; 5:14-cv-57 DE 84-4, Page ID 1630. Although the use of the term "renew" cannot be ignored, its presence is not dispositive. *Klein*, 234 S.W. at 215. We must also consider the other lease terms and the parties' conduct prior to the present controversy. *Id.*

---

[3] Plaintiffs suggest that *North American Refractories Company v. Jacobs*, 324 S.W.2d 495 (Ky. 1959), holds that a condition precedent can attach only to the right to renew. They misinterpret the holding of that case. The *Jacobs* court confronted a contract with both a renewal and extension provision. 324 S.W.2d at 496–97. The right to extend was conditioned on whether the lessee was "mining clay" at the expiration of the lease term. *Id.* at 497. The court held that the lessee had not satisfied this condition necessary to trigger its right to extend. *Id.* There were not any broader pronouncements as to the ability to pair a condition precedent with the right to extend. *See id.*

We turn first to the other lease terms. Both leases provide that additional five-year terms are available "according to the terms hereof and for the same consideration[.]" 5:14-cv-21 DE 81-4, Page ID 1981; 5:14-cv-57 DE 84-4, Page ID 1630. This supports finding a right to extend because there is no need for a new writing to capture a material term. *Cf. Camelot LLC v. AMC ShowPlace Theatres, Inc.*, 665 F.3d 1008, 1010 (8th Cir. 2012) (interpreting Minnesota law to find that a contract could be extended when "all necessary and substantial terms" were contained in the initial writing). Additionally, the leases do not require the lessee (now RDP) to provide notice of its intent to continue for another five-year period, nor do they require any communication between the parties at the end of each five-year period. Such communication would presumably be required if the leases contained a right to renew. The leases, themselves, thus indicate the intent to create a right to extend.

The parties' conduct prior to the present dispute provides further evidence that RDP has a right to extend the 1977 leases. Plaintiffs' strongest argument is to highlight the contractual relationship between 1967 and 1977. They assert that the 1972 and 1977 leases were written renewals of the 1967 leases, indicating the parties' intent to renew in writing every five years. Although the prior execution of a written renewal can evince an intent to create a right to renew, *1651 N. Collins Corp.*, 529 F. App'x at 634, two facets of the parties' conduct convince us that it was the right to extend that was contemplated in the 1977 leases.

First, the suggestion that the 1977 leases were renewals of the 1972 leases ignores the substantive changes that those leases implemented: a new royalty formula for both the Storys and the Clifts; the elimination of the Clifts' minimum royalty per acre quarried; the plaintiffs' right to obtain fifteen tons of agricultural lime each year; and a change from a perpetual lease to a ninety-nine year lease, a period of time that does not purport to date back to 1967. These material

changes indicate that the 1977 leases were not written renewals but rather separate and independent agreements. *See Ala. Farmers Co-op., Inc. v. Jordan*, 440 F. App'x 463, 467 (6th Cir. 2011) (finding a second lease "could not reasonably be deemed a 'renewal'" because it contained different terms such as "an increase in the price of purchase option")

Second, the parties continued under the terms of the 1977 lease without a written renewal for the thirty-five years between 1977 and 2012, when plaintiffs first expressed concern with this practice. In that time, FVQ (and then RDP and its sublessees) quarried the land and paid the Storys and Clifts royalties without any objection. The Story and the Clift complaints reflect this position, as they contain no allegation that RDP failed to renew the lease prior to 2012. This thirty-five-year period weighs heavily in favor of finding that the parties intended a right to extend as opposed to a right to renew.

In light of the other lease terms and the parties' conduct, we conclude that the use of the term "renew" in the 1977 leases is not controlling. *See Lexington Flying Serv.*, 239 S.W.2d at 947. Thus, we find that the 1977 Story lease and 1977 Clift lease granted RDP a right to extend every five years without the need for a written renewal.

B.

Alternatively, the Storys and the Clifts argue that RDP cannot extend the 1977 leases because it and Lafarge have not "well and truly kept and performed" the "stipulations, covenants and agreements" contained in each lease. 16-6346 CA6 R. 24, at 11, 20–38; 16-6347 CA6 R. 23, at 15–30. Each family asserts various deficiencies under the terms of their 1977 lease. We address the claims put forward by the Storys and the Clifts separately as each is unique to RDP's and Lafarge's activities *vis-à-vis* their respective properties.

1.

The Storys assert three ways in which defendants have not complied with the conditions of the 1977 lease so as to preclude them from extending it in 2012—the start of the most-recent renewal period. First, they point to defendants' admitted use of the Story property in conjunction with other lands. Second, they allege that defendants failed to comply with the lease's timber-removal provisions. Third, they claim that RDP failed to pay and account for certain production royalties. We find these arguments unpersuasive and conclude that RDP and Lafarge are entitled to summary judgment as to their compliance with the terms of the 1977 Story lease.

a.

The Storys first argue that RDP and Lafarge failed to comply with the terms and conditions of the 1977 lease by using the Storys' property "in conjunction with the quarrying operations" on "other lands leased, subleased or controlled by RDP[.]"[4] 16-6346 CA6 R. 24, at 8, 28–36. As discussed above, Kentucky interprets such claims as sounding in trespass. *See Wright*, 242 S.W.2d at 752; *Carmichael*, 22 S.W.2d at 575–76. The Storys cannot point to any term or condition of the lease that expressly prohibited RDP and Lafarge from using the property in this manner. Because the lease is silent on this point, RDP and Lafarge did not fail to keep and perform "the stipulations, covenants and agreements herein contained," related to such use. 5:14-cv-21 DE 81-4, Page ID 1981. Accordingly, we refuse to find that RDP is precluded from extending the 1977 lease on this basis.

b.

Next, the Storys claim that RDP and Lafarge "routinely destroyed" all of the timber that was removed from the Story property in the course of operating the quarry. 16-6346 CA6 R. 24, at 36. The lease reserves, to the Storys, "the right to all timber cut by [RDP and Lafarge] on the

---

[4] This same claim was raised as an independent claim for breach of the lease and trespass. *See* Part IV, *supra*.

premises in the course of operation." 5:14-cv-21 DE 81-4, Page ID 1981. The record, however, does not establish the routine destruction of timber. Charles Story was able to recall only two instances where timber was removed from the property. In the first instance, which occurred more than twenty years ago, Story was given the opportunity to remove the timber and removed what he could. The second occurrence was in 2013. Story testified that Mark Champion, a Lafarge employee, notified him that Lafarge needed to remove approximately twelve trees from the property. Champion offered Story the opportunity to remove the timber and Story indicated that he would like such an opportunity. Champion then told Story that the trees needed to be removed within a specific time frame. Story was unable to get around to cutting down the trees within that time frame, so Lafarge felled them.

Neither instance establishes that RDP or Lafarge failed to comply with the conditions of the lease so as to preclude extension. Under the terms of the 1977 lease, the Storys "reserve[d]" the right to timber cut by RDP and Lafarge. Although the lease does not make the Storys responsible for removing the timber that they want, Charles Story indicated, in both instances, that he would remove the timber he wanted within an agreed-upon time frame. When he failed to do so in 2013, it was reasonable for defendants to proceed under the assumption that the Storys had ceded their right to that timber. We struggle to see how it is equitable to punish RDP and Lafarge when Story agreed to remove the trees and then failed to act.[5]

c.

Finally, the Storys argue that RDP failed to pay certain production royalties. The 1977 lease requires RDP to pay the Storys a monthly royalty for all "merchantable limestone rock and other kindred substances" that are "remove[d]" and "quarr[ied]" each month. 5:14-cv-21 DE 81-

---

[5] Even if the Storys could establish that defendants failed to comply with the terms of the lease regarding the removal of timber in 2013, such an act would not have precluded defendants from exercising their right to extend the lease in 2012.

4, Ex. C, Page ID 1979–81. The Storys claim that the lease requires RDP to pay a royalty on large boulders in the month they are actually removed from the quarry wall and not, as is RDP's practice, when the boulder is broken down and run through the primary crusher. They also claim that RDP and Lafarge have removed raw material from their property and used it to build roads and buildings without paying them a royalty for a portion of this material. Given the terms of the lease and the evidence in the record, these claims are without merit.

In the process of quarrying the Story property, there are, at times, large boulders that must be broken down further before they can be crushed and removed from the quarry. Lafarge holds these boulders in the quarry until there are enough to justify the expense of the equipment required to break them down. Lafarge pays a royalty on the merchantable limestone from these boulders when they are broken down and run through the primary crusher. The Storys argue that this practice conflicts with the terms of the 1977 lease because the boulder, itself, constitutes limestone that has been "removed" from the quarry. We disagree. First, when a boulder is still physically in the quarry, it has not been removed. Second, there is no evidence in the record to suggest that a boulder constitutes "merchantable" limestone before it is processed. If it was already fit for sale in a single piece, why would RDP and Lafarge spend additional time, money, and effort breaking down the boulder and running the resulting rock through a crusher? We refuse to read the lease to require RDP to pay a production royalty before the boulders are reduced to a commercially reasonable size. Because there is no dispute that RDP pays the Storys a royalty on the boulders as they are processed through the primary crusher and removed for commercial sale, we conclude that RDP and Lafarge are operating in compliance with the lease on this point.

Additionally, there is no dispute that the 1977 lease requires RDP and Lafarge to pay a royalty on "merchantable limestone rock and other kindred substances" even if they retain the material for their own use. And the record indicates that the Storys' royalty is calculated and paid before any such limestone is put to internal use. The Storys, however, claim that they are entitled to a royalty on any material used by defendants to construct roads and buildings in the quarry on a theory that if such rock has even a marginal value to defendants, it is merchantable. But defendants are not required to pay a royalty on everything they remove from the quarry. That they can use this material for some internal purpose does not necessarily make it merchantable. Thus, there is no basis on which to conclude that RDP and Lafarge have failed to comply with the terms of the lease so as to eliminate defendants' right to extend.

2.

The Clifts also raise three arguments to support their claim that RDP and Lafarge failed, as early as 2002, to satisfy the conditions precedent to extending the 1977 lease. First, they claim that defendants failed to deliver the agricultural lime guaranteed by the lease. Second, they claim that defendants failed to pay royalties for limestone removed from their property. Third, they claim that defendants improperly removed timber from their property. As discussed below, we reject these allegations as either lacking in merit or waived and thus affirm the district court with respect to the Clifts' claims.

a.

The terms of the 1977 lease require defendants "to deliver to the [Clifts] at the Quarries, fifteen ton (15) of agricultural lime each year for and during the life of this lease, free of any cost to the [Clifts]." 5:14-cv-57 DE 84-4, Page ID 1630. The plain language requires RDP or Lafarge only to make agricultural lime available to the Clifts at the quarry. Defendants are not

required to deliver the product elsewhere, nor are they required to provide the Clifts with notice of their right to take delivery. The record suggests that Lafarge set aside fifteen tons of agricultural lime at the quarry each year. It was the Clifts who failed to take delivery of the lime at the quarry. Because defendants complied with the terms of the lease on this point, their actions with respect to the agricultural lime do not preclude their right to extend the lease.

b.

At some point prior to 1998, approximately a quarter acre of the Clift property was quarried and somewhere between 10,000 and 25,000 tons of raw material was removed. The Clifts assert that they are entitled to summary judgment on this point because RDP removed this material and failed to compensate them for the portion that constituted marketable limestone, thereby preventing any extension of the lease. However, the record does not conclusively establish that *RDP* quarried the quarter acre at issue. Although the Clifts allege that the deposition testimony of Lafarge employee Nate Fernow establishes that material was removed around 1998, the transcript does not support such a claim. Fernow testified only that quarrying must have taken place "in or prior to 1998." 5:14-cv-57 DE 84-12, Page ID 1718. The land could have been quarried at any point prior to 1998, including a time before RDP assumed responsibility for the quarry. Furthermore, the Clifts have not provided any evidence that the material removed constituted marketable limestone. Because there is a question of fact as to when the raw material was removed and whether that removal triggered a royalty obligation on the part of RDP, the Clifts are not entitled to summary judgment on this claim.

Defendants, however, are entitled to summary judgment because the Clifts have waived their right to contest RDP's renewal on account of this alleged nonpayment of royalties.

Kentucky defines waiver as the "intentional relinquishment of a known right."  *Bates v. Grain Dealers Nat'l Mut. Fire Ins. Co.*, 283 S.W.2d 3, 5 (Ky. 1955).  Whether a party's actions constitute a waiver is a question of law.  *Eaton v. Trautwein*, 155 S.W.2d 474, 478 (Ky. 1941).  Whether such actions occurred is a question of fact for the jury.  *Id.*  Because Kentucky generally disfavors the forfeiture of leases, we "readily adopt any circumstances that indicate a waiver of forfeiture."  *First Nat'l Bank & Trust Co. v. Martin Marietta Materials, Inc.*, 22 F. App'x 546, 549 (6th Cir. 2001).  "The general rule is that when rent is accepted by a lessor with knowledge of particular conduct which is claimed to be a default on the part of the lessee, acceptance of the rent constitutes a waiver by the lessor of the lessee's default."  *Id.*  Constructive knowledge of a condition is sufficient to establish waiver in Kentucky.  *Batson v. Clark*, 980 S.W.2d 566, 576 (Ky. Ct. App. 1998).

The Clifts received and cashed royalty checks from RDP from the time the lease was executed in 1977 through January 2014.  In that time, they never raised any concern with respect to the quarter acre at issue.  And although the record does not indicate that the Clifts had actual knowledge, prior to January 2014, that a quarter acre had been quarried without a corresponding royalty payment, there is sufficient evidence to establish constructive knowledge.  The Clifts have farmed the seventy-two acre tract they lease to RDP since 1977.  We struggle to see how they could fail to notice that 10,000 to 25,000 tons of stone and dirt had been removed when they were regularly present between 1998, the point at which the quarter acre was undisputedly quarried, and 2014, when the Clifts stopped accepting RDP's checks.  We thus conclude that the Clifts have waived their right to terminate the lease on this basis.

c.

Finally, the Clifts argue that defendants cannot extend the lease because Lafarge removed trees from the Clifts' property without providing them the opportunity to claim the timber. In doing so, they point to an access road constructed by Lafarge at some point in 2012. The record indicates that there is a genuine dispute as to whether trees were cut for the access road and whether the Clifts received notice and access to any timber that may have been removed, especially when construing all reasonable inferences the Clifts' favor. This conclusion is strengthened by RDP's concession on appeal that Lafarge "cleared a stand of trees to make way for the access road." 16-6347 CA6 R. 33, at 9. It was thus incorrect for the district court to grant defendants summary judgment for the reason that it did.

However, we still affirm the district court's decision because the Clifts waived their ability to raise this claim by accepting royalty checks for over a year after the timber was allegedly removed in 2012. We have previously held that accepting lease payments for less time constituted waiver. *See First Nat'l Bank & Trust Co.*, 22 F. App'x at 548–49. And we find a sufficient basis for constructive knowledge given that the Clifts were farming the property. *See* Section V.B.2.b, *supra*.

VI.

Finally, both the Storys and the Clifts argue that their leases should be reformed by the court because changed circumstances have made the leases unconscionable. The Storys also argue that their operative lease with RDP was both procedurally and substantively unconscionable when it was executed in 1977 and should be declared void. The district court rejected both theories of unconscionability. We agree.

A.

The Storys and Clifts argue that their leases have become unconscionable over time because the royalty RDP receives is now six times the amount they receive for the same limestone. Through its sublease with Martin Marietta, RDP receives a larger fixed royalty per ton removed (30.33¢, compared to the 7.5¢/4.5¢ structure in the Story and Clift leases) and RDP is guaranteed a minimum royalty tied to the average retail price of limestone, a provision not present in the Clift and Story leases. This alone, however, does not establish that the 1977 leases have become unconscionable.

As an initial matter, it is unclear whether Kentucky recognizes a theory of unconscionability on account of changed circumstances. The Kentucky Supreme Court has never addressed the issue. Plaintiffs point to *Kentucky West Virginia Gas Co. v. Interstate Natural Gas Co.*, 2000 WL 1228222 (Ky. Ct. App. June 9, 2000) (unpublished) (noting a "considerable paucity" of Kentucky law on the issue and finding that a natural gas lease had become unconscionable over time because of a dramatic increase in the market price), to argue that Kentucky courts will reform a contract that has become unconscionable due to changed circumstances.[6] Defendants argue the opposite, pointing to *May v. Johnson Family Coal Co.*, No. 2002-CA-1493-MR, 2003 WL 21554968, at *1 (Ky. Ct. App. July 11, 2003) (finding "no valid reason to interfere with the lease except for [appellants'] dissatisfaction with the bargain that they made, and from which they have accepted the fruits for many years"), and *Johnson v. Thornbury*, No. 2002-CA-833-MR, 2003 WL 21674208, at *4 (Ky. Ct. App. July 18, 2003)

---

[6] In *Neely v. Consol Inc.*, we considered the persuasive authority of *Kentucky West Virginia Gas Co.* and suggested that we could not consider the case because of Kentucky's procedural rules for the citation of unpublished decisions. 25 F. App'x 394, 401–02 (6th Cir. 2002). Our decision in *Neely*, however, ignored *Managed Health Care Associates, Inc. v. Kethan*, 209 F.3d 923, 929 (6th Cir. 2000), which held that Kentucky's procedural rules as to the citation of unpublished decisions do not bar us from considering those decisions for their persuasive value. We decline, however, to weigh the value of *Kentucky West Virginia Gas Co.* here because even if we were to assume the Kentucky Supreme Court would follow the decision, plaintiffs' unconscionability claim fails on the merits.

(rejecting an unconscionability claim due to a lack of evidence that the royalty provisions of a coal-mining lease were anything more than a "bad bargain").

At best, Kentucky's intermediate appellate courts appear split as to whether and when it is appropriate to reform a contract on account of changed circumstances. Fortunately, we need not decide this issue definitively. Even if we assume that Kentucky would accept such a theory of unconscionability, plaintiffs' claim—one that relies solely on the fact that RDP receives a greater per-ton royalty than what plaintiffs receive—fails.

First, plaintiffs ignore the circumstances of RDP's royalty arrangement with Lafarge. In part, the royalty allows RDP to recoup a return on the approximately $2.5 million upfront investment by its predecessor and the eleven years during which the quarry operated without realizing any profit. RDP must also pay rents, royalties, taxes, and other costs out of the gross royalty it receives from Lafarge. The Clift and Story royalties, by contrast, represent only the value of the limestone and the access to their property. It is inappropriate to compare the two in determining whether the terms of the 1977 leases are fair to plaintiffs.

Second, the record indicates that similarly situated landowners receive a royalty payment between two and ten cents per ton of limestone removed. The royalty structure for the Storys and the Clifts is well within this range.

Third, *Kentucky West Virginia Gas Co.* is factually distinguishable. That case relied, in part, on factual findings about the market price for natural gas and Kentucky West's treatment of similarly situated lessees. Here, there is no evidence in the record as to the market price for limestone. And the only evidence as to similarly situated landowners suggests that the Storys and the Clifts are being paid a comparable rate. This lack of evidence weighs strongly against a finding that the leases have become unconscionable. *See Johnson*, 2003 WL 21674208, at *4.

For these reasons, we affirm the district court's refusal to reform the Story and Clift leases on account of changed circumstances.

B.

The Storys also argue that the 1977 lease was unconscionable at the time it was executed.[7] "A fundamental rule of [Kentucky] contract law holds that, absent fraud in the inducement, a written agreement duly executed by the party to be held, who had an opportunity to read it, will be enforced according to its terms." *Schnuerle v. Insight Commc'ns Co.*, 376 S.W.3d 561, 575 (Ky. 2012) (quoting *Conseco Fin. Serv. Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. Ct. App. 2001)). Unconscionability is a "narrow exception" that "police[s] the excesses of certain parties who abuse their right to contract freely." *Id.* "It is directed against one-sided, oppressive and unfairly surprising contracts" but not "against the consequences *per se* of uneven bargaining power or even a simple old-fashioned bad bargain." *Id.* (citation omitted); *see also Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013). "An unconscionable contract is 'one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other.'" *Schnuerle*, 376 S.W.3d at 575 (quoting *Conseco*, 47 S.W.3d at 342).

"Procedural unconscionability relates to the process by which an agreement is reached and to the form of the agreement." *Energy Home*, 406 S.W.3d at 835. This includes "the use of fine or inconspicuous print and convoluted or unclear language that may conceal or obscure a contractual term." *Id.* (citing *Schnuerle*, 376 S.W.3d at 576–77). Kentucky courts look at "the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms,

---

[7] Although the Storys allege both procedural and substantive unconscionability, their claim is entirely procedural in nature, as it concerns the relative bargaining positions of the parties and not any inequity in the lease terms. Accordingly, we consider only whether the contract was procedurally unconscionable.

and the presence or absence of a meaningful choice." *Schnuerle*, 376 S.W.3d at 576 (quoting

*Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 875–76 (11th Cir. 2005)).

As an initial matter, the lease is not facially problematic. Procedural unconscionability

may exist if there are "[o]ppressive terms ancillary to the main bargain" that are "concealed in

fine print" or "couched in vague or obscure contractual language." *Schnuerle*, 376 S.W.3d at

576. A review of the 1977 lease shows that this was not the case. It was clearly written with just

over three pages of terms. Although the lease uses legal language, it is not so obtuse as to

prevent a reader from understanding the implications of each provision. Charles Story conceded

that he "had some time to think about [the lease] and contemplate it" and that his family chose

not to engage their uncle, an attorney, to review the proposed lease. 5:14-cv-21 DE 81-2, Story

Dep., Page ID 1905–07.

The Storys claim that the 1977 lease is unconscionable because FVQ presented it as a

"take it or leave it" option and that they had "no choice but to accept" the 1977 lease because

FVQ intended to renew the 1972 lease if the Storys did not accept the 1977 agreement. CA6 R.

24, at 42–43. A take-it-or-leave-it option, however, does not make a contract compulsory in

Kentucky. *Cf. Energy Home*, 406 S.W.3d at 836. Instead of signing the 1977 lease, the Storys

could have chosen to maintain the status quo. That is, they could have continued under the terms

of the 1972 lease—terms that they had previously bargained for. Additionally, the 1977 lease

was arguably more favorable to the Storys than the 1972 lease. It increased the royalty rate,

provided them an annual delivery of agricultural lime, and placed a ninety-nine-year limit on the

renewal, as opposed to the perpetual renewal term in the 1972 lease.

The Storys also allege that FVQ misrepresented its ability to renew the 1972 lease and

failed to advise them that the 1977 lease, unlike the 1972 lease, could be renewed for more than

one five-year term.  This allegation defies the plain language of the 1972 lease.  That lease stated that it "may be renewed . . . for five additional years and at intervals of five years hereafter so long as said conditions have been kept and performed."  5:14-cv-21 DE 78-3, Page ID 1681.  As the district court recognized, this is a valid contractual term.  Kentucky does not favor perpetual leases, but finds them acceptable, valid, and enforceable where the language is "clear, plain and unambiguously expressed."  *Farris v. Laurel Explosives, Inc.*, 797 S.W.2d 487, 489 (Ky. Ct. App. 1990) (citing *Vokins v. McGaughey*, 266 S.W. 907, 909 (Ky. 1924) ("[W]here the intention to create a right of renewal in perpetuity is clearly and unambiguously expressed, the obligation so created is valid and enforceable.")).  Such was the language in the 1972 lease.  Because there was no difference in FVQ's ability to renew the 1972 and 1977 leases, it could not have misled the Storys in the way that they allege.

For these reasons, we find that the 1977 Story lease was not unconscionable at the time it was executed.

## VII.

Martin Marietta seeks to be dismissed from this consolidated appeal, arguing that it is an unnecessary party because neither the Storys nor the Clifts have a viable claim against it.  Martin Marietta asserts that RDP should have filed a cross-appeal to preserve any claim for indemnification.  Because RDP is entitled to summary judgment, however, there is no basis on which it could seek indemnification from Martin Marietta.  Therefore, we deny Martin Marietta's pending motions to dismiss as moot.

## VIII.

For the foregoing reasons, we affirm the district court's grant of summary judgment to defendants and deny Martin Marietta's pending motions as moot.